NON-CONFIDENTIAL VERSION

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | | |
|---|---|---|
| VIETNAM FINEWOOD COMPANY LIMITED, FAR EAST AMERICAN, INC. AND LIBERTY WOODS INTERNATIONAL, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) | Consol. Ct. No. 22-00049 |
| INTERGLOBAL FOREST LLC, | ) ) | |
| Consolidated Plaintiff | ) | **NON-CONFIDENTIAL VERSION** |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| COALITION IN FAIR TRADE IN HARDWOOD PLYWOOD, | ) ) ) | |
| Defendant-Intervenor | ) ) ) | |

## PLAINTIFFS RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION

## FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
J. Kevin Horgan
Judith L. Holdsworth
Alexandra H. Salzman
Vivien J. Wang
**deKieffer & Horgan, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs Finewood, FEA, Liberty*

Dated: August 15, 2022

NON-CONFIDENTIAL VERSION

# TABLE OF CONTENTS

I.   RULE 56.2 STATEMENT ...........................................................................1

     A.   Administrative Determinations Subject to Appeal ...............................1

     B.   Issues Presented ........................................................................2

II.  STANDARD OF REVIEW ..........................................................................2

          Substantial Evidence Standard...........................................................2

          Arbitrary and Capricious Standard.....................................................3

III. STATEMENT OF FACTS ...........................................................................3

     A.   Scope of the Hardwood Plywood Orders............................................3

     B.   Finewood's Two-Ply Panels .........................................................4

     C.   Procedural Background................................................................5

IV.  SUMMARY OF ARGUMENT .....................................................................9

V.   ARGUMENT..........................................................................................10

     A.   Two-Ply Panels Finewood Purchased From China Are Not Subject
          Merchandise............................................................................10

          1. Legal Standard for Scope Determination.......................................10

          2. Two-Ply Raw Materials for Plywood Construction Are Not
             Subject To the Orders Based on the Plain Language of the
             *Hardwood Plywood* Orders. ...................................................11

          3. Commerce Erred In Its (k)(1) Analysis. ......................................14

               a.   The Petition and Revisions to the Scope Language Prior
                    to Initiation and Commerce's Preliminary Scope Memo
                    in the Investigation...................................................15

               b.   Commerce Did Not Investigate Two-Ply In the AD
                    Investigation.........................................................19

               c.   The ITC Did Not Investigate Two-Ply Panels...........................21

<u>NON-CONFIDENTIAL VERSION</u>

       d.  Commerce Improperly Rejected Plaintiffs' Citation to
(k)(1) Materials ........................................................................24

    4.  Commerce's Substantial Transformation Analysis is
Unnecessary. ..........................................................................27

B.  Country of Origin of Finished Hardwood Plywood. ...........................................28

    1.  Legal Standard for Substantial Transformation Analysis ...................28

    2.  Class or Kind Criterion Should Be Given No Weight Based on
Facts In This Case. ..................................................................29

    3.  The Product Properties, The Essential
Components/Characteristics of the Merchandise, and Intended
End-Use of the Finished Product Were Imparted in the Third
Country, i.e., Vietnam .........................................................30

    4.  The Nature and Sophistication of Processing in Vietnam
Weighs In Favor of A Finding of Substantial Transformation. ...........34

    5.  Finewood's Value-Added in Vietnam is Substantial.. .........................39

    6.  The Level of Investment Factor Weighs In Favor of Finding
Substantial Transformation ......................................................44

VI.     CONCLUSION ...........................................................................47

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**CASES**

*Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016).....................40

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000)........................ 2-3

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) ................................................................3

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)...........................................2

*Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281 (Ct. Int'l Trade 2019) .......28, 31, 46

*Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ....... 28, 29-30

*Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262 (Fed. Cir. 2004)........................13

*Diversified Products Corp. v. United States*, 572 F. Supp. 883, 888 (1983)..................................2

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ..........................................10

*Fedmet Res. Corp. v. United States*, 755 F.3d 912 (Fed. Cir. 2014) ............................................10

*King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cr. 2012)) ..............................................10

*Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349 (Ct Int'l Trade 2020) ...................................................................................................................41

*Linyi Chengen Imp. & Exp. Co. v. United States*, 539 F. Supp. 3d 1269 (Ct. Int'l Trade 2021) ...................................................................................................................40

*Maquilacero S.A. De C.V. v. United States*, 256 F. Supp. 3d 1294 (Ct. Int'l Trade 2017) ...................................................................................................................23

*Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 131 (Ct. Int'l Trade 2015)....................19

*MCC Holdings v. United States*, 537 F. Supp. 3d 1350 (Ct. Int'l Trade 2021) ...................... 22-23

*Meridian Prods., LLC v. United States*, 890 F.3d 1272 (Fed. Cir. 2018)......................... 25-26, 27

*Midwest Fastener Corp. v. United States*, 494 F. Supp. 3d 1335 (Ct. Int'l Trade 2021)..............27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........................3

*Peer Bearing Co. – Changshan v. United States*, 128 F. Supp. 3d 1266 (Ct. Int'l Trade

2015) ...............................................................................................................30, 31, 43

*Saha Thai Steel Pipe Pub. Co. v. United States*, 547 F. Supp. 3d 1278 (Ct. Int'l Trade 2021) ...........................................................................................................................26

*Star Pipe Prods. v. United States*, 365 F. Supp. 3d 1277 (Ct. Int'l Trade 2019) .........................22

*TMB 440AE, Inc. v. United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019) ........................26

*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951) ...............................................................2

*Walgreen Co. v. United States*, 620 F.3d 1350 (Fed. Cir. 2010) ...................................................10

*Whirlpool Co. v. United States*, 890 F.3d 1302 (Fed. Cir. 2018) ..................................................10


**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ..........................................................................................................2

19 U.S.C. § 1677(10) .....................................................................................................................22

19 U.S.C. § 1677j(b) .......................................................................................................................27


**REGULATIONS**

19 CFR § 351.225(k)(1) ....................................................................................................... *passim*

19 C.F.R. § 351.225(k)(2) ..........................................................................................................8, 11

**ADMINISTRATIVE DECISIONS**

*Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018) ..................................................... 1, 3-4, 11, 13

*Certain Hardwood Plywood Products from the People's Republic of China*, *Countervailing Duty Order*, 83 Fed. Reg. 513 (Dep't Commerce Jan. 4, 2018).................... 1, 3-4

*Certain Hardwood Plywood From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Scope Inquiry*, 85 Fed. Reg. 3024 (Dep't Commerce Jan. 17, 2020) .............................................................................................................5

NON-CONFIDENTIAL VERSION

*Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,157 (Dep't Commerce Dec. 1, 2020).................................................................................40

*Hardwood Plywood from China*, Inv. Nos. 701-TA-565 & 731-TA-1341, USITC Pub. 4747, 2017 ITC LEXIS 1583, *16-17 & *98 (Dec. 2017) ...........................................22

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Dep't Commerce Jan. 6, 2010) .......................29

*Second Redetermination Pursuant to Court Remand Order in Bell Supply Co., LLC v. United States*, Ct, No. 14-00066 (Dep't Commerce Aug. 11, 2016)........................................ 41-42

Plaintiffs Vietnam Finewood Company Limited ("Finewood"), Far East American, Inc. ("FEA"), and Liberty Woods International, Inc. (Liberty) submit this Memorandum of Law in support of their Motion for Judgement on the Administrative Record pursuant to Rule 56.2 of the Rules of this Court.

## I.      RULE 56.2 STATEMENT

### A.    Administrative Determinations Subject to Appeal

Plaintiffs seek judicial review of the U.S. Department of Commerce's ("Commerce") final scope ruling finding that Chinese two-ply that consists of two sheets of core veneers bonded by glue purchased by Finewood is within the scope of the antidumping ("AD") and countervailing duty ("CVD") orders on certain hardwood plywood from the People's Republic of China.  *See Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (January 4, 2018) ("AD Order"); *see also Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (January 4, 2018) ("CVD Order") (collectively, the "Orders").  Plaintiffs further contest Commerce's determination that finished hardwood plywood produced by Finewood in Vietnam that incorporates such two-ply and other individual veneers were not substantially transformed into a product of Vietnam.

The challenged determination, findings, and conclusions are set out in Commerce's unpublished memorandum, Dep't Commerce, Memorandum re: *Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China, Enforcement and Protect Act (EAPA) Investigation No. 7252: Final Scope Ruling* (Jan. 21, 2022), **P.R.[1]141, C.R.135**, ("Final Scope Ruling").

---

[1] Plaintiffs reference the Antidumping Public Record, **ECF No. 23-1**, as "**P.R.**", and the Antidumping Confidential Record as "**C.R.**", **ECF No. 23-2**.

1

**B.    Issues Presented**

1.    <u>Issue One</u>: Commerce's Scope Ruling that Finewood's two-ply panels purchased from China is covered by the scope of the *Hardwood Plywood Orders*, based on the plain scope language and the (k)(1) factors, is unsupported by substantial evidence, arbitrary and capricious, and contrary to law.

2.    <u>Issue Two</u>: Commerce's substantial transformation analysis finding that Finewood's two-ply panels were not substantially transformed in Vietnam by Finewood's production of finished hardwood plywood was not supported by record evidence and contrary to law.

## II.    STANDARD OF REVIEW

<u>**Substantial Evidence Standard**</u>

The Court holds unlawful any aspect of Commerce's final determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" must be measured by a review of the record as a whole, "including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Thus, "it is appropriate to set aside the ITA's decision when the court 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to [its] view.'" *Diversified Products Corp. v. United States*, 6 CIT 155, 161, 572 F. Supp. 883, 888 (1983) (*quoting Universal Camera*, 340 U.S. at 488). Further, "Commerce's total failure to consider or discuss record evidence which, on its face, provides significant support for an alternative conclusion renders the

Department's determination unsupported by substantial evidence." *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1165 (2000).

**Arbitrary and Capricious Standard**

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983 (citations omitted). An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## III.   STATEMENT OF FACTS

### A.   Scope of the Hardwood Plywood Orders

Commerce issued the *Hardwood Plywood Orders* on January 4, 2018. *See* AD Order, 83 Fed. Reg. 504; CVD Order, 83 Fed. Reg. 513. In the *Hardwood Plywood Orders*, Commerce defined the scope as follows:

> The merchandise subject to this investigation is **hardwood and decorative plywood, and certain veneered panels as described below**. For purposes of this proceeding, **hardwood and decorative plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo**. The veneers, along with the core may be glued or otherwise bonded together. Hardwood and decorative plywood may include products that meet the American National Standard for Hardwood and Decorative Plywood, ……
>
> ……

AD Order, 83 Fed. Reg. at 512; CVD Order, 83 Fed. Reg. at 515 (Emphasis Supplied).

**B.    Finewood's Two-Ply Panels**

The Chinese-origin two-ply panels that Finewood purchased as a raw material for its plywood production consisted of two layers of core veneers glued together. *See* Finewood Questionnaire Response at 9-10 (Apr. 9, 2020) ("Finewood QR"), **P.R.26, C.R.3**. As Finewood described, its plywood is produced from core veneers, where the core veneers are glued together to form a core platform, with the face and back veneers attached to the core platform to form the completed plywood. *Id.* Finewood never used only a single two-ply as the core to produce plywood. *Id.* To achieve the desired thickness, Finewood glued multiple two-ply panels to form the core platform before applying the face and back veneers; or did not consume the two-ply at all, producing plywood from individual face, back and core veneers. Critically, "[s]ince the 2-ply performed the same function as individual core veneers, Finewood used it the same way as it would use other core veneers... 2-ply goes through all the inspection, gluing, repairing, and pressing processes as other veneer until the result is the core itself. The finished cores then undergo puttying and sanding processes before the face/back veneers enter such processes to be bound to the core and finished into plywood through additional processes such as trimming, sanding, pressing, UV coating, etc." *Id.*

Finewood never sold any two-ply panels to the United States. The only product Finewood sold to the United States was finished hardwood plywood consisting of at least three plies. As discussed below, Finewood's two-ply panels are intermediate raw material products and completely different than finished plywood. Hardwood plywood, including Finewood's hardwood plywood exported to the United States, is sold on the basis of grade, type of core, overall panel thickness, face species, and type of glue used. In contrast, the two-ply panels that

Finewood purchased exhibit none of the essential characteristics of finished hardwood plywood and can only reasonably be characterized as semi-finished raw materials.

### C.    Procedural Background

On August 15, 2018, U.S. Customs and Border Protection ("Customs" or "CBP") initiated an evasion investigation conducted under the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "Enforce and Protect Act" or "EAPA," against Plaintiff Finewood and its U.S. customers including Plaintiffs FEA and Liberty.  *See* Dep't Commerce, Memorandum to File: Placement of Covered Merchandise Referral Documents on the Record, Attachment: (Jan. 21, 2020), **P.R.9-11**.  Customs imposed interim measures on November 29, 2018.  *See id*.  After a year-long EAPA investigation and a successful on-site verification at Finewood, Customs made a scope referral to Commerce to determine "whether the 2-ply cores of Chinese origin, which are further processed in Vietnam to include the face and back veneers of non-coniferous wood, are within the scope of the orders."  *Id.*  Four months after the September 16, 2019 referral, Commerce initiated the instant scope inquiry.  *See* Dep't Commerce, *Certain Hardwood Plywood From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Scope Inquiry*, 85 Fed. Reg. 3024 (Jan. 17, 2020).

On March 12, 2020, Commerce issued to Finewood a comprehensive questionnaire that covers, *inter alia*, Finewood's corporate structure, personnel, raw material purchases, plywood production, and sales operations, which Finewood timely responded to in two filings.  *See* Finewood QR, **P.R.26, C.R.3**; Finewood Questionnaire Response of Certain Exhibits (Apr. 23, 2020) ("Finewood QR Pt II"), **P.R.28, C.R.4-7**.  As Finewood explained in this questionnaire response, the company was established in December 2017 and operated from April to November

2018 when CBP first announced its EAPA investigation 7252 with the imposition of over 200%

AD CVD cash deposit rates on all of Finewood's shipments.  *See* Finewood QR at 1-3.

Finewood effectively ceased operations after November 2018 for lack of orders.  *Id.*

Nevertheless, Finewood kept its records, essential personnel, and factory to fully cooperate with

CBP's year-long investigation and verification. The company did not dissolve until September

2019.  *Id.*

Almost *a year* after the initial questionnaire, Commerce issued a complex supplemental

questionnaire to Finewood which was akin to the initial Sections C & D questionnaire issued to a

mandatory respondent in antidumping proceedings.  *See* Commerce Ltr. to Finewood, Re:

Supplemental Questionnaire (Mar. 2, 2021), **P.R.42-44, C.R.11-13**.  Commerce also requested

that Finewood comment on the substantial transformation analysis factors.  *Id.*  On March 17,

2021, Finewood filed a letter notifying Commerce of its difficulties in responding, because

Finewood had been dissolved in September 2019 and company records were left behind in

Vietnam when its owners and managers went back to China, not anticipating that a global

pandemic would hinder travel between China and Vietnam.  *See* Finewood - Notice of

Difficulties in Responding to the Department's Supplemental Questionnaire (Mar. 17, 2021),

**P.R.54**.  In March 2021, the records that Finewood still had access to are the documents

submitted to CBP in the EAPA investigation in 2019 while Finewood still existed.  However,

CBP never asked Finewood to report cost data for auxiliary materials, energy, labor consumption

data and raw material consumption in the manner now requested by Commerce.  *Id.*  For this

reason, Finewood requested that Commerce place on the record the factors of production

("FOP") data from the Chinese mandatory respondent in Commerce's first antidumping

administrative review in *Hardwood Plywood from China 2017-18* ("POR 1").  Finewood

reasoned that the 2017-18 annual review period covered Finewood's entire production period and, thus, was contemporaneous. Further, the mandatory respondent in that review, Linyi Chengen Import and Export Co., Ltd. ("Chengen"), was the sole mandatory respondent so that Commerce could use Chengen's FOP data and Section D questionnaire response generally as neutral facts available. *Id.* Chengen's data was the best available information also because the factories share highly similar production steps, used similar equipment in production, and both were located in non-market economy countries. *Id.* Commerce did not respond to Finewood's request before the supplemental questionnaire response was due, so Finewood placed Chengen's information on the record under the regulations. *See* Finewood, Re: Scope Inquiry - Placing Information from POR 1 on the record (Apr. 13, 2021) ("Chengen POR1 Records"), **P.R.62-84, C.R.25-96**. On March 30, 2021 and April 13, 2021, Finewood timely filed its supplemental questionnaire response including the consumption data and FOP build-up. *See* Finewood Supplemental Questionnaire Response – Part I (Mar. 30, 2021) ("Finewood SQR Part I"), **P.R.59, C.R.14-24**; Finewood Supplemental Questionnaire Response – Parts II & III (Apr. 13, 2021) ("Finewood SQR Parts II & III"), **P.R.85-90, C.R.97-116**.

In subsequent comments and rebuttal comments in relation to Commerce's request for parties to analyze the substantial transformation test, Finewood argued that the unambiguous language of the *Hardwood Plywood Orders* excluded any and all products consisting of less than three plies. *See* Finewood's Supplemental Questionnaire Response – Part IV, Information on Substantial Transformation at 7-8 (Apr. 20, 2021) ("Finewood SQR Part IV"), **P.R.91-92, C.R.117-123**; *see also*, Finewood QR at 14-17 & Exhibit 12, **P.R.26, C.R.3**. Finewood argued that its reading of the plain scope language is supported by previous court decisions on the definition of plywood as well as the relevant explanatory notes to the Harmonized Tariff

Schedule published by the World Customs Organization ("ENs"), which CBP replies upon in classifying products. *See* Finewood SQR Part IV at 10-11. Finewood next argued that none of the sources listed in 19 C.F.R. § 351.225(k)(1)(2020) ("(k)(1) materials") support a finding that Finewood's two-ply panels are within the scope of the Orders. *Id.* at 11-14. Moreover, the factors listed in 19 C.F.R. § 351.225(k)(2)(2020) ("(k)(2) factors") also support the conclusion that two-ply panels are outside of the scope of the Orders. *Id.* at 14-20. Further, under the substantial transformation analysis, Finewood argued that the upstream two-ply and the downstream finished plywood fell into a different class or kind of products, and the processing in Vietnam changes the important qualities and use of the two-ply. Furthermore, the nature and sophistication of processing in Vietnam, the value added to the two-ply, and level of investment in Vietnam are significant. *See generally*, *id.* at 2-8, 21-39; *see also,* Finewood's Rebuttal to Petitioner's Additional Information (Apr. 30, 2021) ("Finewood Apr. 30 Rebuttal"), **P.R.100, C.R.125**; Finewood's Sur-Rebuttal to Petitioner's May 4, 2021 Rebuttal Comments (May 13, 2021) ("Finewood Sur-Rebuttal"), **P.R.107, C.R.127.**

On August 26, 2021, Commerce issued its Preliminary Scope Ruling, finding that the plain scope language does not define the "certain veneered panels." Therefore, the scope language is ambiguous and not dispositive in determining whether "two-ply panels, generally, are included within the scope of the *Orders.*" *See* Dep't Commerce, Memorandum re: *Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China, Enforcement and Protect Act (EAPA) Investigation No. 7252: Preliminary Scope Ruling* (Aug. 26, 2021) ("Prelim. Scope Ruling") at 10-12 **P.R.110, C.R.128**, & Preliminary Analysis Memo ("Prelim. Analysis Memo"), **P.R.111, C.R.129-130**. Based on (k)(1) sources, Commerce determined that the phrase "certain veneered panels"

encompasses Finewood's two-ply panels.  *Id.* at 12-14.  Commerce also found that all factors under the substantial transformation test support a finding that the two-ply panels were not substantially transformed in Vietnam.  *Id.* at 15-32.

On September 30, 2021, Plaintiffs jointly filed comments challenging all aspects of Commerce's preliminary scope determination.  *See* Finewood, FEA, and Liberty ("DH Respondents") – (rejected) Comments on Preliminary Scope Ruling (Sept. 30, 2021), **P.R.125, C.R.131**; DH Respondents - Resubmission of Comments on Preliminary Scope Ruling (Dec. 14, 2021) (refiling rejected Sept. 30, 2021 comments to comply with Commerce's request to remove references to documents from the underlying *Hardwood Plywood Order* AD Investigation that were not previously placed on the record) ("DH Respondents Revised Cmts."), **P.R.138, C.R.134**.

On January 21, 2022, Commerce issued its final determination, concluding that Finewood's two-ply panels are within the scope of the *Hardwood Plywood* Orders based on the ambiguous scope language and the (k)(1) factors.  Final Scope Ruling at 9-20.  Commerce did not change any of its determinations for the specific factors under the substantial transformation analysis.  *See id.* at 20-43.

## IV.    SUMMARY OF ARGUMENT

The scope language of the *Hardwood Plywood* Orders define the subject merchandise as having a minimum of three plies: a face veneer, a back veneer, and a core.  The plain language of the Orders do not cover two veneer sheets glued together (so-called "two-ply panels" that are really semi-finished raw materials).  Further, the sources listed in 19 CFR § 351.225(k)(1) do not support Commerce's conclusion that the scope of the Orders includes two-ply panels.  Therefore, Commerce's scope ruling concerning two-ply panels was not supported by substantial evidence

and was arbitrary and capricious.  Finally, Commerce's conclusion that two-ply panels from China were not substantially transformed in the production of finished plywood in Vietnam is not supported by substantial evidence.

## V.   ARGUMENT

### A.   Two-Ply Panels Finewood Purchased From China Are Not Subject Merchandise.

#### 1.   Legal Standard for Scope Determinations

In a scope ruling, Commerce starts from the plain scope language of the applicable AD/CVD Orders.  *See Walgreen Co. v. United States*, 620 F.3d 1350. 1356 (Fed. Cir. 2010) ("The primary source in making a scope ruling is the antidumping order being applied.").  "The plain language of a countervailing or antidumping order is 'paramount' in determining whether particular products are included within its scope."  *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 918 (Fed. Cir. 2014) (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1345 (Fed. Cr. 2012)).  "Scope orders may be interpreted as including subject merchandise **only if** they contain language that **specifically includes the subject merchandise** or **may be reasonably interpreted to include it**."  *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (emphasis supplied).  Further, although Commerce has the authority to clarify an order's scope, it cannot interpret an order "in a way contrary to its terms," nor in a way "so as to change the scope of that order."  *Whirlpool Co. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018) (internal citation omitted).

If the plain scope language is unclear, then Commerce must turn to the (k)(1) criteria, which includes: (i) the petition, (ii) the initial investigation, and (iii) any earlier determinations by Commerce and the ITC.  *See* 19 C.F.R. § 351.225(k)(1) (2020).  The (k)(1) sources are "afforded primacy in the scope analysis [] because interpretation of the language used in the

orders must be based on the meaning given to that language during the underlying investigations." *Fedmet Res. Corp.*, 755 F.3d at 921.  If the (k)(1) sources do not dispositively resolve the matter, Commerce must then turn to the criteria under (k)(2), which include (i) the physical characteristics of the product, (ii) the expectations of the ultimate purchasers; (iii) the ultimate use of the product, (iv) the channels of trade, and (v) the manner in which the product is advertised and displayed.  19 C.F.R. § 351.225(k)(2) (2020).

Applying these principles to the *Hardwood Plywood Orders* and to the facts in this case, the only reasonable conclusion supported by substantial evidence is that two-ply panel is non-scope merchandise.

> **2.     Two-Ply Raw Materials for Plywood Construction Are Not Subject To the Orders Based on the Plain Language of the Hardwood Plywood Orders.**

Commerce's determination that the plain language of the orders was ambiguous regarding "certain veneered panels" is erroneous.  *See* Final Scope Ruling at 10-11.  Commerce claimed that "{a}lthough the first sentence of the scope of the *Orders* identifies subject merchandise as 'hardwood and decorative plywood, and certain veneered panels,' the description in the second sentence of the scope only defines 'hardwood and decorative plywood' (*i.e.*, the first of these terms)."  Therefore, Commerce found that the term "certain veneered panel" is undefined.  *Id.*

In fact, however, the scope definition unambiguously states in the very first sentence that the "certain veneered panels" that are in the scope of the *Hardwood Plywood Orders* are the veneered panels "described below."  *See* AD Order, 83 Fed. Reg. at 512 ("The merchandise subject to this investigation is hardwood and decorative plywood, **and certain veneered panels as described below**.") (emphasis supplied).  And, indeed, veneered panels *are* described

immediately thereafter – unambiguously – as "consisting of two or more layers or plies of wood and a core," i.e., consisting of at least three layers.  *Id.* ("For purposes of this proceeding, hardwood and decorative plywood is defined as a **generally flat, multilayered plywood** or ***other veneered panel, consisting of two or more layers or plies of wood veneers <u>and</u> a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo**."). (Emphasis Supplied).  Finewood, in contrast, imported two core veneers without a face or back veneer.

Reading the scope language plainly, in the first sentence, "hardwood and decorative plywood" and "*certain* veneered panels" overlap to some extent, but not completely.  "Certain" is used as a quantifier in this first sentence, meaning "some particular members of the group" of veneered panels, but not all.  *See* COBUILD Advanced English Dictionary. Copyright © HarperCollins Publishers, available at https://www.collinsdictionary.com/us/dictionary/english/certain#:~:text=If%20you%20are%20certain%20about,have%20no%20doubt%20about%20it (last accessed August 14, 2022).  In the second sentence, the scope language immediately explains that *for purposes of this proceeding*, the term "hardwood and decorative plywood" can be: (1) a generally flat, multilayered plywood, or (2) *other* veneered panels, which are then defined as consisting of "two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo."

In the final scope ruling, Commerce improperly speculated that "if the definition of 'hardwood and decorative plywood' were intended to also define 'certain veneered panels,' the express inclusion of 'certain veneered panels' in the first sentence of the scope, which was not in the original language proposed by the Petitions, would be unnecessary."  Final Scope Ruling at

11.  The original language proposed by the Petition will be discussed below as it pertains to (k)(1) sources.  However, by the same logic, if the "other veneered panels" defined in the second sentence were not the same as "certain veneered panels" mentioned in the first sentence, the express inclusion of "certain veneered panels, *as described below*" in the first sentence, which was not in the original language proposed by the Petitions, would also be unnecessary.

Commerce's argument that "the description in the second sentence of the scope only defines 'hardwood and decorative plywood' is a fiction that makes no sense because the scope language defining the subject merchandise as a panel with a minimum of three plies clearly applies to both hardwood and decorative plywood and "other veneered panels."  **"*Other (adjective)*** is defined as*: "***b:** being the one or ones distinct from that or those first mentioned or implied"; https://www.merriam-webster.com/dictionary/other (last accessed June 10, 2022).

Thus, the "certain" and "other" veneered panels can be distinguished from "plywood," which is defined as follows in trade cases: "(1) there must be at least three layers; (2) each layer must be arranged at a right angle to its adjacent layer; and (3) the layers must be bonded together."  *Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262, 1265 (Fed. Cir. 2004).  Namely, the core of the subject merchandise is not limited to individual veneers arranged *at a right angle* to its adjacent layer, but rather "may be composed of a range of materials, including but not limited to hardwood, softwood, particleboard, or medium-density fiberboard (MDF)."  AD Order, 83 Fed. Reg. at 512 (MDF has no grain or grain direction so it cannot be said to be set at an angle to the face or back veneers with directional grain).

Commerce's argument is circular with respect to the "certain veneered panels" in the first sentence where Commerce assumes that the unambiguous language "described below" and the

definition of "other veneered panels" as "consisting of two or more layers or plies of wood and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo" do not mean what the plain language says it means and is therefore ambiguous.  Critically, the term "hardwood and decorative plywood" is used in the scope language from the second sentence and forward.  The term includes plywood, which meets the definition of veneered panel, and *other* veneered panels that consist of two or more layers or plies of wood veneers and a core, where the core may be composed of materials other than individual wood veneer(s).  The two modifying clauses in the second sentence: "consisting of two or more layers or plies of wood and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or Bamboo" is clearly used to modify both nouns before it, *i.e.*, (1) a generally flat, multilayered plywood, and (2) veneered panels.  The Court therefore must reject Commerce's reading of the scope language that ignores the plain and reasonable reading of the scope language.

### 3.    Commerce Erred In Its (k)(1) Analysis.

After determining that the term "certain veneered panel" is undefined in the scope language, Commerce turned to the 19 C.F.R. § 351.225(k)(1) sources including the Petitions, the ITC Final Report, and prior determinations to bring the two-ply panel into the scope.  Final Scope Memo at 16-20.  Commerce's (k)(1) analysis and its determination that two-ply panels are included in the scope is contrary to record evidence.  The initial Petition and the scope language adopted prior to the initiation of the investigations clearly demonstrate that Petitioner only intended to cover plywood products composed of three plies of more.  Commerce's reliance on the AD investigation's preliminary scope memo is misplaced.  Further, there is not a scintilla of evidence that supports the claim that Commerce or the U.S. International Trade Commission ("ITC") ever considered two-ply panels in their respective investigations.

     **a.** **The Petition and Revisions to the Scope Language Prior to Initiation and Commerce's Preliminary Scope Memo in the Investigation.**

Petitioner filed the underlying AD and CVD Investigation Petitions on November 18,

2016. *See* Finewood SQR Part IV at Exhibit SQ1-25 (Ltr. from Wiley Rein to Commerce, Re:

Petitions for the Imposition of Antidumping and Countervailing Duties, Vol. I, at 4-5 (Nov. 18,

2016) ("Petition Vol. I")), **P.R.91-92, C.R.117-123**. Petitioner defined the subject merchandise

under section E.1. "Scope of Investigation." *Id.*

On December 2, 2016, counsel for Petitioner participated in a conference call with eight

Commerce officials and seven Customs officials to discuss "{i}ssues relating to the proposed

scope of the investigations." *Id.* at Exhibit SQ1-27 (Dep't Commerce, Memorandum to File re:

Meeting with Counsel to Petitioner and Customer {*sic.*} and Border Protection (Dec. 7, 2016)).

On December 6, 2016, Petitioner filed a letter revising the scope language. *Id.* at Exhibit

SQ1-26 (Ltr. from Wiley Rein to Commerce, Re: *Certain Hardwood Plywood Products from the*

*People's Republic of China*, at 1-2 & Ex. 1 (Dec. 6, 2016) ("Revised Scope Language")). The

relevant section in the revised scope language is the same as the scope language in Commerce's

December 16, 2016 published Initiation Notice as well as the language of the final scope

language in the published *Hardwood Plywood Orders.* A side-by-side comparison of the

relevant language in these two versions of scope of the Orders is provided below for ease of

reference, with certain altered language bolded and italicized:

| Scope Language in the Nov. 18, 2016 Petition: | Revised Scope Language in Petitioner's Dec. 6, 2016 Letter: |
|---|---|
| The merchandise subject to this investigation is hardwood and decorative plywood. | The merchandise subject to this investigation is hardwood and decorative plywood, ***and certain veneered panels as described below***. |

| | |
|---|---|
| Hardwood and decorative plywood is a ***flat panel*** composed of an assembly of two or more layers or plies of wood veneers in combination with a core. | ***For purposes of this proceeding***, hardwood and decorative plywood is defined as a ***generally flat, multilayered plywood or other veneered panel,*** consisting of two or more layers or plies of wood veneers and a core, with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo. |
| The veneers, along with the core, are glued or otherwise bonded together to form a finished product. | The veneers, along with the core may be glued or otherwise bonded together. |
| A hardwood and decorative plywood panel must have at least either the face or back veneer composed of one or more species of hardwood or bamboo. | |
| …… | …… |
| A "veneer" is a thin slice of wood which is rotary cut, sliced or sawed from a log, bolt or flitch. The face veneer is the exposed veneer of a hardwood and decorative plywood product which is of a superior grade than that of the back veneer, which is the other exposed veneer of the product (i.e., as opposed to the inner veneers).  When the two exposed veneers are of equal grade, either one can be considered the face or back veneer. For products that are entirely composed of veneer, such ***as Veneer Core Platforms***, the exposed veneers are to be considered the face and back veneers, in accordance with the descriptions above. | For purposes of this investigation a "veneer" is a slice of wood regardless of thickness which is cut, sliced or sawed from a log, bolt, or flitch. ***The face and back veneers*** are the outermost veneer of wood on either side of the core irrespective of additional surface coatings or covers as described below. |
| The core of hardwood and decorative plywood consists of the layer or layers of one or more material(s) that are situated between the face and back veneers. The core may be composed of a range of materials, including but not limited to veneers, particleboard, and medium-density fiberboard ("MDF"). | The core of hardwood and decorative plywood consists of the layer or layers of one or more material(s) that are situated between the face and back veneers. The core may be composed of a range of materials, including but not limited to hardwood, softwood, particleboard, or medium-density fiberboard (MDF). |

Petitioner, after having a meeting to discuss the "proposed scope of the investigations" with eight Commerce officials and seven Customs officials, modified the first sentence to add "certain veneered panels as described below" and expanded the definition of "hardwood and decorative plywood" from "a flat panel" to "a generally flat, multilayered plywood or other veneered panel."  It is inconceivable that Petitioner then simply forgot to define what is "certain veneered panel."  Indeed, "certain veneered panel" is defined in the scope as panels of more than three plies and with the face and/or back veneer being made of hardwood or bamboo.  This is further supported by Petitioner's response to an interested party's request to remove the phrase "veneered panel" in the investigation.

During the AD and CVD investigations, an importer, Richmond International Forest Products ("RIFP"), requested that Commerce remove the reference to "certain veneered panels" in the scope language because "there is no specific description of the physical characteristics or uses that define 'certain veneered panels' as *distinct* from the specifically defined 'hardwood and decorative plywood.'"  *See* Finewood Sur-Rebuttal at Exhibit SR-1 (May 13, 2021) (Dep't Commerce, Re: *Certain Hardwood Plywood Products from the People's Republic of China*: Scope Comments Decision Memorandum for the Preliminary Determinations, at Cmt. 4 (Apr. 17, 2017) ("Inv. Prelim. Scope Memo")), **P.R.107, C.R.127.** (Emphasis Supplied).

Petitioner opposed RIFP's request, as summarized by Commerce, because:

Petitioners state that the **WCO defines plywood as being "three or more sheets of wood glued and pressed one on the other and generally disposed so that the grains of successive layers are at an angle." Petitioners state that WCO defines a veneered panel, on the other hand, as a veneer of wood (in this case a hardwood) which has been affixed to a base (including the core) of inferior wood or a non-wood product.** Petitioners state that an example of a veneered panel could be a three-ply hardwood panel with oak front and rear faces and with a core of particle board or a core of medium-density fiberboard (MDF).

*Id.* (emphasis supplied). Petitioner's response confirms that the addition of "certain veneered panel" to the scope language was merely to resolve the discrepancy between (1) "plywood" defined in the WCO and the *Boen Hardwood Flooring* Court, cited above, and (2) "plywood" intended to be covered in the scope. The ENs define "plywood" as composed of "three or more sheets of wood," meaning that the *core also must* be a sheet of wood, and cannot be a type of composite wood products such as MDF or non-wood products. On the other hand, the EN definition of "veneered panel" *does not* require that the product consist of only "sheets of wood," but instead can have layers that are made of "inferior wood" or "non-wood product." Therefore, Petitioner added the term "certain veneered panels" to reference in-scope products that do not meet the definition of "plywood" in the tariff schedule by the WCO's definition.

Commerce, in its final scope ruling, claims that the example given in Petitioner's rebuttal comments "describes a hardwood plywood product, rather than a veneered panel." *See* Final Scope Ruling at 19. In fact, Commerce's statement completely contradicts its preliminary scope memo in the *Hardwood Plywood* investigation, which states that "an example of a **veneered panel** could be a three-ply hardwood panel with oak front and rear faces and with a core of particle board or a core of medium densify fiberboard (MDF)." Inv. Prelim. Scope Memo at Cmt. 4. (Emphasis supplied).

Likewise, Commerce's claim that the now-removed phrase "veneer core platforms" in the original Petition confirms Petitioner's intent to include two-ply panels is illogical. *See* Final Scope Ruling at 15; Petition Vol. I at 4-5 (see original scope language above referencing "Veneer Core Platforms"). Petitioner's reference to this undefined term, "Veneer Core Platforms," was not even in the first paragraph describing the subject merchandise, but in a paragraph defining "veneer." Petition Vol. I at 4.

After the Dec. 2, 2016 meeting with Commerce and Customs and in the Dec. 6, 2016 Revised Scope Language, Petitioner removed the term "veneer core platform" altogether from the proposed scope language, added the phrase "certain veneered panels *as described below*" to the first sentence of the plywood scope definition, and added in the second sentence the introductory clause "for purposes of this proceeding," i.e., within the scope of the investigations is plywood or other veneered panels that consist of "two or more layers or plies of wood veneers and a core" and "with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo."  *See* Revised Scope Language above.  Thus, the petition, the conference between Commerce, Customs, and Petitioners' legal counsel, and the scope language revisions prior to initiation of the investigations all support the conclusion that "certain veneered panels" were defined and described in the scope language as consisting of at least three layers or plies. Veneered panels consisting of only two plies are not included in the scope of the *Hardwood Plywood Orders*.

### b.  Commerce Did Not Investigate Two-Ply In the AD Investigation.

In its Final Scope Ruling, Commerce erred in dismissing Finewood's argument that it never required respondents in the AD investigation to identify two-ply panels in its initial hardwood plywood product characteristics.  *See* Final Scope Ruling at 19-20.

In identifying similar subject merchandise to compare normal value to U.S. price, Commerce uses a model-matching methodology based on a hierarchy of product characteristics that are commercially significant to the merchandise at issue.  *See Maverick Tube Corp. v. United States*, 107 F. Supp. 3d 131, 1329 (Ct. Int'l Trade 2015).  Commerce does not attempt to account for every conceivable characteristic when selecting matching criteria but prioritizes the most meaningful characteristics in CONNUM building.

In the *Hardwood Plywood* AD investigation, CONNUMs were constructed from product characteristics found in Fields 3.1 through 3.12.  *See* Finewood Sur-Rebuttal at Exhibit SR-2 (Dep't Commerce, Re: Product Characteristics and Deadline for Sections C and D of the Antidumping Duty Questionnaire (Jan. 12, 2017) ("CONNUM Memo")), **P.R.107, C.R.127.**  In particular, Field 3.6 describes "Core Composition."  *Id.*  And Commerce did not give an option for respondents to choose "none," as it did for Fields 3.10: Surface Coating and 3.11: Minor Processing.  Commerce understood that subject merchandise must have a face veneer (Fields 3.1-3.3), a back veneer (Fields 3.4-3.5), and a core (Field 3.6).  Under Field 3.6: Core Composition, the assigned two-digit codes all correspond to specific composition of the material of the core layer(s), while the last option is "10-n Other – specify."  However, the narrative description provided under Field 3.6 clearly states that "{i}f the core layer(s) are made of multiple materials, report 'other' in this field and specify each combination of materials for each unique product," with no option to say "none."  *Id.*  Normally, there are "additional product characteristics" not included in the CONNUM because they are less critical, and respondents are instructed to contact the Commerce officials in charge if they had any concerns on how to report data in such fields.  *See e.g.*, *id.* at Field 3.13: Number of Plies.  However, Field 3.6: Core Composition, is not such an "additional product characteristics."  This confirms that Commerce understood that subject merchandise must have a core layer or layers.

In addition, Finewood argued that Commerce's supplemental questionnaires issued throughout the investigation gave no indication that it considered two-ply veneered panels to be in-scope merchandise.  *See* DH Respondents Revised Cmts. at 15-17, **P.R.138, C.R.134**.  Commerce does not dispute that it did not issue questionnaires or supplemental questionnaires on two-ply panels during the investigation, but argued that it did not question the respondent

regarding two-ply panels because the respondent (i.e., Chengen) reported that all its sales to the United States were of subject merchandise, and therefore, there was no need to issue supplemental questionnaires to elicit information about merchandise purported to be non-subject. *See* Final Scope Ruling at 20.

Commerce's rationale is exactly backwards. Chengen was only required to report in its Sections C & D its "subject merchandise" U.S. sales. Based on the plain scope language and the CONNUM Memo, Chengen would have only treated sales of three-ply panels or more as subject merchandise, and would not have reported two-ply panels sales, if any. If, after initiating the AD investigation and issuing the Jan. 2017 CONNUM Memo, Commerce had an epiphany on April 17, 2017 that two-ply panels are included in the plywood scope, Commerce would have issued supplemental questionnaires to Chengen to confirm that Chengen did not make two-ply panel sales to the U.S., or in the alternative, report its sales of two-ply panels as subject merchandise, Indeed, nothing on the record shows that Commerce ever considered two-ply panels to be subject merchandise.

### c.   The ITC Did Not Investigate Two-Ply Panels.

Commerce found that the term "certain veneered panels" was part of the scope of the ITC's investigations, and the ITC defined the domestic like product as coextensive with the scope of the investigation. Therefore, the ITC must have specifically considered "certain veneered panels," including two-ply panels, in its injury investigation. *See* Final Scope Ruling at 13. Plaintiffs, however, did not argue that ITC did not consider "certain veneered panel." Instead, the issue is whether the ITC considered two-ply panels. Commerce's circular argument (i.e., two-ply is included in the scope as "certain veneered panel," the ITC referenced and hence

considered "certain veneered panel" in its injury determination, and therefore, the ITC considered two-ply in its injury determination) must be rejected.

In ITC's final injury report, directly after the text of Commerce's scope definition, the ITC provides *its* definitive understanding of the subject merchandise covered by the scope of the investigations: "{h}ardwood and decorative plywood ***is a wood panel product made from gluing two or more layers of wood veneer to a core*** which may itself be composed of veneers or other type of wood material such as medium density fiberboard ('MDF'), particleboard, lumber, or oriented strand board." *Hardwood Plywood from China*, Inv. Nos. 701-TA-565 & 731-TA-1341, USITC Pub. 4747, 2017 ITC LEXIS 1583, *16-17 & 98 (Dec. 2017) (emphasis added); *see also* 19 U.S.C. § 1677(10) (defining a "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation"). The ITC does not refer to two-ply veneered panels anywhere in its final report. The ITC indeed does not discuss "two-ply" at all. The term "veneered panels" appears *only* separately in the text of the scope definition, text of the U.S. tariff schedule, and in one reference to out-of-scope substitute products found on the U.S. market for "hardwood plywood veneered panels." *Id.* at *9, *87, *97, *138. It is therefore clear that the product investigated by the ITC is something made from gluing two or more layers of veneer to a core – thus at least three plies.

Commerce is not free to ignore or disregard the ITC's understanding of the products covered by its injury investigation. As the CIT recently found: "{r}ead in the entirety, the ITC Report contains evidence lending weight to a conclusion that Star Pipe's flanges are not subject merchandise. Under 19 C.F.R. § 351.225(k)(1), Commerce was not free to ignore this evidence." *Star Pipe Prods. v. United States*, 365 F. Supp. 3d 1277, 1286 (Ct. Int'l Trade 2019). In a related case the CIT also stated: "{t}he Department's regulation, 19 C.F.R. § 351.225(k)(1), required

Commerce to consider the ITC Report, and it may not do so in a way that disregards probative evidence therein on the limits of the scope of the ITC investigation and like product." *MCC Holdings v. United States*, No. 18-00248, 2021 Ct. Intl. Trade LEXIS 112, at *19 (Ct. Int'l Trade Aug. 26, 2021).

Finally, the ITC's understanding of the scope of the investigations and the product definition that governs the extent of its injury investigations takes precedent over any other consideration of the sources listed in 19 CFR § 351.225(k)(1).  Namely, the U.S. antidumping law requires that the ITC's investigation of material injury to the relevant domestic industry include the merchandise covered in the Department's AD and CVD orders.

> To the extent that Commerce is arguing that the ITC's final determination does not take precedence over factors found in § 351.225(k)(1), it misstates the law. Commerce may not interpret an order to include products for which the ITC has issued a negative injury determination. *See Wheatland Tube Co. v. United States*, 21 CIT 808, 819, 973 F. Supp. 149, 158, SLIP OP. 97-100 (1997) ("A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. . . . It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law." (*citing* 19 U.S.C. § 1673 (1994)).

*Maquilacero S.A. De C.V. v. United States*, 256 F. Supp. 3d 1294, 1311 (Ct. Int'l Trade 2017).

In this instant case, Commerce's scope ruling that Finewood's two-ply panels are within the scope of the *Hardwood Plywood Orders* is refuted by the ITC's findings and understanding that the scope merchandise and domestic like product consist of two or more layers of wood veneer glued to a core.  Commerce cannot include two-ply panels in the scope of the Plywood Orders because the ITC did not include two-ply panels or veneers in its injury investigation.

In sum, the plain language of the scope excludes two-ply panels.  Nothing in the Petition, Commerce's initial investigation, or the ITC's injury investigation suggest that wood panels consisting of only two plies are included in the scope of the Orders.  Therefore, the (k)(1) factors dispositively exclude two-ply panels, and Commerce's claims to the contrary are unsupported by substantial evidence.

### d.  Commerce Improperly Rejected Plaintiffs' Citation to (k)(1) Materials.

After Commerce released its preliminary scope ruling on August 26, 2021, Plaintiffs submitted their comments on Commerce's preliminary scope ruling on September 30, 2021, which included an analysis of certain (k)(1) materials, including Commerce's consideration of "veneered panels" in the original plywood investigation.  *See* DH Respondents - (rejected) Cmts. on Prelim. Scope at 13-19, **P.R.125, C.R.131**.  Commerce rejected portions of Plaintiffs' September 30, 2021 comments because they allegedly included "factual information from documents on the record of the investigation segment of this proceeding, but not on the record of this scope inquiry."  *See* Dep't Commerce, Ltr. re: Vietnam Finewood Company Limited Comments on the Preliminary Scope Ruling (Dec. 10, 2021), **P.R.136**.  As Commerce instructed, Plaintiffs resubmitted their comments on the preliminary scope ruling on December 14, 2021, omitting under protest the sections that Commerce claimed included new factual information. *See* DH Respondents Revised Cmts., **P.R.138, C.R.134**.

Plaintiffs' citations to the investigation record (which Commerce rejected) resulted from Plaintiffs' due diligence in searching all of the (k)(1) materials for any reference by Petitioner or Commerce that the subject merchandise, or specifically "certain veneered panels," included two-ply panels.  In addition to Petitioner's and Commerce's filings, Plaintiffs searched the complete ITC Final Report for any mention that the scope of the investigation could be construed to

include two-ply panels.  Plaintiffs' search revealed that Petitioner, Commerce, and the ITC always defined the subject merchandise as composed of at least three layers or plies.  DH Respondents Revised Cmts. at 6-19.  In its Final Scope Ruling, Commerce indicated that it had not considered all (k)(1) materials in this case but rather is "bound to base its conclusions on the record evidence before it."  Final Scope Ruling at 15, **P.R.141, C.R.135**.  Commerce also noted that no party had placed the ITC Final Report on the record in its entirety.  *Id*. at 13.

To be sure, the record evidence as it stands and accepted by Commerce provides no support for Commerce's final conclusion that the scope of the investigation includes two-ply panels.  Nevertheless, 19 CFR § 351.255(k)(l) does not limit Commerce's consideration of the investigation record to only certain filings or types of filings.  Rather, Commerce's obligations to consider descriptions of the merchandise contained in the initial investigation extends to the whole investigation record.  Commerce must consider Petitioner's submissions during the initial *Hardwood Plywood* investigation regardless of whether any party put portions of the investigation materials on the record of the scope inquiry or otherwise referred to such documentation.  Specifically, 19 C.F.R. § 351.225(k)(1) mandates: "the Secretary *will* take into account the following: (1) The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." (Emphasis Supplied).  No party can relieve Commerce of its inquiry obligations under 19 CFR § 351.255(k)(l).  In the citations that Commerce finds offensive in the DH Respondents' Comments on the Preliminary Scope Determination in this case, the DH Respondents merely point to those portions of the investigative record that Commerce was obligated to consider of its own accord in its final determination.

The Courts have on numerous occasions ruled that Commerce must look to the (k)(1)

materials to determine whether the scope is ambiguous or not, including investigation documents

and ITC determinations. For example, in *Meridian Products*, the Federal Circuit stated that

Commerce's regulation "clarified the legal framework required of Commerce in making scope

ruling determinations." *Meridian Prods., LLC v. United States*, 890 F.3d 1272, 1277 (Fed. Cir.

2018) (where the scope of a case cannot be resolved by reference to the plain language of the

order, Commerce must consider the sources identified in its regulations. *Id.* (citing 19 C.F.R. §

351.225(k)(1)).  In other words, the (k)(1) materials are legal authority, not merely factual

information.

In a recent case involving imported pipe products, the Court of International Trade

reiterated this important legal requirement for Commerce's scope inquiries.  *TMB 440AE, Inc. v.*

*United States*, 399 F. Supp. 3d 1314 (Ct. Int'l Trade 2019).  In *TMB 440AE*, the record before the

Court evidently did not include the whole investigation record, but primarily Plaintiff's citations

to some investigation documents and parts of the ITC report.  *TMB 440AE*, 399 F. Supp. 3d at

1321.  The Court admonished Commerce, however, stating:

> By not considering the (k)(1) sources, as required by regulation, Commerce created
> a situation in which duties might be assessed against products without an injury
> determination. Indeed, preventing such a result is likely why the applicable
> regulations state that Commerce "will take into account" the (k)(1) criteria,
> including the ITC determination. 19 C.F.R. § 351.225(k).

*Id.* at 1322.

In *Saha Thai*, the Court found, contrary to Commerce's challenged scope ruling, that

"{i}n this case, the (k)(1) materials must be read." *Saha Thai Steel Pipe Pub. Co. v. United*

*States*, 547 F. Supp. 3d 1278, 1290 (Ct. Int'l Trade 2021).  In reviewing the (k)(1) materials, the

Court consulted the ITC's first and second sunset reviews of the relevant orders as (k)(1)

materials even though no party put such ITC publications on the administrative record of

Commerce's scope inquiry.  *Id.* at 1297.

In conclusion, in scope inquiries, the (k)(1) materials are legal authority that Commerce

must consult to inform on the meaning of the scope language of an antidumping or

countervailing duty order.  *Meridian Prods., LLC v. United States*, 890 F.3d 1272, 1277 (Fed.

Cir. 2018); *see also Midwest Fastener Corp. v. United States*, 494 F. Supp. 3d 1335, 1340 (Ct.

Int'l Trade 2021) ("{w}hen considering the scope language, Commerce will take into account

descriptions of the merchandise contained in: (1) the petition; (2) the initial investigation; and (3)

past determinations by the Commission and by Commerce, including prior scope determinations

(collectively '(k)(1) sources')").  Commerce improperly rejected Plaintiffs' citations to (k)(1)

materials in this case.

### 4.  Commerce's Substantial Transformation Analysis is Unnecessary.

If the Court agrees with Plaintiffs that the scope language and the (k)(1) factors

sufficiently confirm that subject merchandise must include at least three plies – a core, a face ply,

and a back ply – and does not cover two-ply panels, then a further analysis of Commerce's

substantial transformation criteria is unnecessary.  Plaintiffs have found no instances in which

Commerce or the courts conducted a substantial transformation analysis on an upstream product

found to be outside the scope of the relevant AD and CVD orders.  Logically, in such instances,

the substantial transformation analysis does not make sense: if the out-of-scope upstream product

*is not* substantially transformed by downstream processing, then the downstream product is still

out of scope; if the out-of-scope upstream product *is* substantially transformed by downstream

processing, then the downstream product is a product of the country in which the downstream

processing took place.  Congress has enacted a specific Statute, 19 U.S.C. § 1677j(b), for which the express purpose is to prevent circumvention through imports of "merchandise completed or assembled in other foreign countries," where the third-country processing is minor or insignificant.  19 U.S.C. § 1677j(b).

### B. Country of Origin of Finished Hardwood Plywood.

#### 1. Legal Standard for Substantial Transformation Analysis

In the alternative, if the Court disagrees with Finewood's above arguments that two-ply panels are not subject merchandise, this Court nevertheless should find that Commerce's substantial transformation analysis unsupported by evidence or contrary to law.  The record demonstrates that through Finewood's processing in Vietnam, the Chinese two-ply panel lost its identity and is substantially transformed into a new and different article, finished plywood.  The proper country of origin of the plywood exported by Finewood to the U.S. is Vietnam.

To determine if substantial transformation has occurred, Commerce considers five factors: (1) class or kind, (2) essential characteristics, (3) nature/sophistication of processing in the exporting country, (4) value added, and (5) level of investment.  *See* Final Scope Ruling at 8; *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1287-1288 (Ct. Int'l Trade 2019) ("*Bell Supply V*").  Commerce uses the totality of the circumstances test to analyze each factor and no factor is dispositive in and of itself.  Final Scope Ruling at 23 ("… Commerce continues to consider the totality of the circumstances of all relevant criteria."); *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1236, 1343 (Ct. Int'l Trade 2019) ("*Bell Supply VI*").  Further, "[a]lthough a totality of the circumstances analysis eschews bright line rules for balancing, Commerce must explain how each factor weighs in the balance and why."  *Bell Supply V*, 348 F. Supp. 3d at 1295.

2. **Class or Kind Criterion Should Be Given No Weight Based on the Facts In This Case.**

In its Preliminary Scope Ruling, Commerce took the position that it has "generally found that substantial transformation has taken place when the upstream and downstream products fall within two different classes or kinds of merchandise…{c}onversely, Commerce almost invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise." *See* Prelim. Scope Ruling at 17. This position is inconsistent with the "totality of the circumstances" test, which implies that Commerce must consider all five criteria, rather than focusing on one. As Commerce stated, "there is no hierarchy in determining what factor alone determines substantial transformation, the Department must weigh available information with respect to each factor and make decisions based on the particular circumstances unique to each case." *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010) & accompanying IDM at 7 (citing three prior determinations) (Dec. 28, 2009).

Further, in cases where the upstream input materials and downstream product are included in the relevant AD/CVD Order, this Court has criticized Commerce's reliance on the class or kind criterion. In *Bell Supply*, the input material was green tubes and the downstream product was oil country tubular goods "OCTG." The Order covers certain OCTG, "whether finished (including limited service OCTG products) or unfinished (including green tubes and limited service OCTG products)" from China. *Bell Supply VI*, 393 F. Supp. 3d at 1233-34. Commerce found on remand that both the input material and downstream product were covered in the same order, hence they are the same "class or kind." The Court noted that it appears "where Commerce elects in the investigation to keep the class together, Commerce's subsequent

consideration of this factor in its substantial transformation inquiry amounts to 'we decided they were the same, therefore they are the same.'" *Id.* at 1239.  Further, although Commerce's overall country-of-origin determination was sustained in *Bell Supply*, the Court found that Commerce's circular class or kind analysis was not supported by the record and "[i]t neither detracts from nor supports Commerce's totality-of-the-circumstances analysis." *Id.*

To be sure, Plaintiffs do not argue that the "class or kind" criterion cannot be a part of Commerce's substantial transformation analysis *per se*; rather, Commerce cannot legally defend that it "invariably determines substantial transformation has not taken place when both products are within the same 'class or kind' of merchandise," as it did in the Preliminary Scope Ruling. Moreover, in *Bell Supply* and *Peer Bearing Co. – Changshan v. United States*, 128 F. Supp. 3d 1266 (Ct. Int'l Trade 2015), the plain scope language of the relevant orders published in the Federal Register covers both the material input and finished product.  In this case, two-ply panels as an input to plywood are not covered by the plain scope language (as published in the Federal Register).  According to Commerce, the scope language does not define "certain veneered panels." Final Scope Ruling at 11.  Nor does the *Hardwood Plywood* scope include "parts" of plywood.  Commerce therefore cannot rely on the scope language of the Orders to determine that Finewood's two-ply panels are of the same class or kind as finished hardwood plywood. Commerce's circular analysis of "class or kind" based on what is included in the scope is unacceptable and deserves no weight in this proceeding.

### 3. The Product Properties, The Essential Components/Characteristics of the Merchandise, and Intended End-Use of the Finished Product Were Imparted in the Third Country, i.e., Vietnam.

Commerce determined that the essential characteristics of the two-ply panels and their suitability for use in future production of plywood were imparted in China, therefore weighing in

favor of finding no substantial transformation.  *See* Final Scope Ruling at 28-29.  Commerce

rejected Plaintiffs' argument that it must compare Finewood's two-ply panels from China with

the downstream product - finished plywood in Vietnam, and instead analyzed where the essential

characteristics of the two-ply panels were imparted.  *Id.*  Commerce's analysis neglects a basic

question: A two-ply panel produced in China naturally retains *its* essential characteristics in

China, because the product is identical to itself.  That is true for any input material that is

produced in any country.  Indeed, the "essential characteristics" criterion is meaningful only if

Commerce compares the product properties, the essential characteristics, and the intended end-

use between the input materials from China and finished goods in Vietnam.

In *Bell Supply*, Commerce determined that the essential components of "both finished

and unfinished OCTG" is the green tube produced in China.  *See Bell Supply V*, 348 F. Supp. 3d

at 1291.  Commerce also determined that the physical and chemical properties of the OCTG did

not "change significantly" as a result of the third-country processing, and the processing in the

third country (i.e., heat treatment) was not required in order for the product to be used for oil and

gas extraction.  *Id.* at 1291-92.  The Court affirmed Commerce's comparative analysis.  *Id.*

Likewise, in *Peer Bearing III*, the Court first analyzed that a TRB is "designed and built to

perform load-bearing and friction-reducing functions in the machine to which it is fitted," and

then found that evidence on the record did not demonstrate that "any single part exported from

China to Thailand possessed the physical properties, mechanical properties, or essential character

of a complete TRB."  *Peer Bearing III*, 128 F. Supp. 3d at 1293 {internal quotation omitted}.

In this case, the distinguishing physical characteristics of finished hardwood plywood are

imparted through the process of laying out and gluing veneers to construct a plywood panel with

face, back, and core.  To produce hardwood plywood, "[t]he veneers are attached with their grain

in alternating directions –crossbands—*in order to provide strength and stability to the finished product*." *See* USITC Pub. 4747, 2017 ITC LEXIS 1573, *107. (emphasis supplied).  Indeed, the "construction process gives it dimensional stability and makes it resistant to expansion and contraction caused by humidity." *Id.* at *99-100.  In contrast, the two-ply panels Finewood purchased were not sanded and puttied, have no stability that finished plywood exhibits through layers of stacking and gluing veneer; nor are they otherwise prepared for face and back veneer application.  The photographs taken by Finewood's importer during its plant visit prior to the EAPA case, which were previously submitted in the EAPA investigation to CBP, can best demonstrate that two-ply panels do not possess the same stability as finished hardwood plywood. *See* Finewood's SQR Part IV at Exhibit SQ1-28 (Photos of Veneer, Two-Ply Panels, and Plywood), **P.R.91-92, C.R.117-123**.  Single veneer sheets are shown in pictures 3 and 6; two-ply panels are <u>circled</u> in pictures 9 and 10; core platforms and plywood are shown in pictures 7, 8, 12, 13.  *Id.*  The two-ply panels are clearly distinguishable from the more rigid core platforms and plywood.  Indeed, two-ply panels are visibly more similar to single sheets of veneer raw materials.

Commerce criticized Finewood's pictures of the two-ply panels, stating that "nowhere in the images submitted by Finewood are two-ply panels specifically identified," by captions.  *See* Final Scope Ruling at 29-30.  However, that set of photos was submitted by the U.S. importer in April 2019 in its first supplemental questionnaire response to Customs, a year and half before Customs made the scope referral to Commerce on two-ply panels.  *See* Finewood's SQR Part IV at 14-15.  The bolded heading before Picture 1 also makes it clear that the exhibit was meant to show CBP pictures of plywood production stages the importer observed during two plant visits.

*Id.* at Exhibit SQ1-28.  The exhibit was not meant to show CBP specific photos of two-ply panels, thus no captions were added to distinguish two-ply panels.

The fact that two-ply panels do not exhibit the same stability and rigidity as plywood panels are further supported by online pictures posted by U.S. sellers.  Finewood found no advertisements for two-ply panels online and the closest product it found was "two-ply veneer." *Id.* at 20 & Exhibit SQ1-35 (webpage printouts from three different sellers of two-ply veneer). These photos all demonstrate that two-ply veneers are flexible and can be rolled-up like single sheets of veneers.  *Id.* at Exhibit SQ1-35; *but see, id.* at Exhibits SQ1-29 through SQ1-32 (pictures from hardwood plywood sellers showing rigid plywood panels).  Plywood panel's stability also informs its intended end-use, i.e., construction of cabinets, furniture, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles.  *See* USITC Pub. 4747, 2017 ITC LEXIS 1573, *99.  Indeed, two-ply panels purchased by Finewood clearly cannot be directly used for any such purposes.  Not only are the two-ply panels not esthetically pleasing for such uses (*see* Pictures in Exhibit SQ1-28), they also cannot hold weight like finished plywood due to a lack of structural stability.  Finewood also compared the commercial invoices for the two-ply panel invoice and that of the finished hardwood plywood, demonstrating that two-ply panels are sold by size only, while plywood are sold on the basis of grade, face species, type of core, overall panel thickness.  *See* Finewood SQR Part IV at 17 & Exhibits SQ1-33, SQ1-34.  Commerce did not analyze such evidence at all.

Commerce faulted Finewood for not addressing how its two-ply panels of [          ]mm thick are distinguishable from Chengen's [     ] m3 of a [          ], poplar core product that was [     ]mm thick from AD POR 1.  *See* Final Scope Ruling at 30.  To be precise, Chengen sold a total of [          ] m3 of such product in POR 1, which is [     ] of its entire POR U.S. sales.

*See* Chengen POR 1 Information at Exhibit AI-2 (Apr. 13, 2021), **P.R.62-84, C.R.25-96.**

Notably, thickness is not the *only* essential characteristics of Chengen's [        ] plywood.

Chengen's product has [                    ] face veneers, [            ] back veneers, and

[                          ].  The two-ply panels Finewood purchased only has two layers of

poplar cores.  Chengen's [        ] product went through the entire production process of

plywood, including [                                            ].  *Id.* at

Exhibit AI-3.  This processing provides the strength and stability to the finished plywood, which

Finewood's glued two-ply panels did not have when they left China.  Indeed, the essential

characteristics of Finewood's finished plywood are imparted in Vietnam through Finewood's

processing.  Commerce's finding to the contrary is not supported by record evidence and

contrary to law.

### 4.  The Nature and Sophistication of Processing in Vietnam Weigh In Favor of Finding Substantial Transformation.

Commerce found that it takes [   ] steps to produce two-ply panels in China or [   ] steps

to produce finished plywood in China, but Finewood's production in Vietnam of finished

plywood from two-ply panels only involves [   ] steps, and therefore the nature and

sophistication of the processing that occurs in China is greater.  *See* Final Scope Ruling at 34

(citing Prelim. Scope Ruling at 24; Prelim. Analysis Memo at 1 & Att. 4, *unchanged in final*).

Commerce's analysis should be rejected for several reasons, as explained below.

First, Commerce discounted [              ] Finewood's production stages in Vietnam.  *See*

Prelim. Analysis Memo at Att. 4, **P.R.111, C.R.129-130**; Finewood SQR Part I at Exhibit SQ1-

8, **P.R.26, C.R.3**.  These [   ] steps are [

                          ].  *Id.*  Commerce cannot omit them without

justification.

Second, as a general matter, Commerce noted that the production steps cannot be based on a respondent's supplier, but that it should take a "holistic view of the production of subject merchandise," to avoid potential manipulation related to counting production steps by Finewood. Final Scope Ruling at 35.  There is no legitimacy in Commerce's assumption.  As Commerce is aware, Finewood's two-ply panels are all purchased from a third-country reseller.  *See e.g.*, Finewood QR Pt II at Exhibit 4, **P.R.28, C.R.4-7**.  Finewood has never argued that the two-ply production process should be limited to one step, i.e., Finewood's purchase of two-ply panels from the reseller.

Moreover, Commerce does not dispute that it prepared its own analysis of the steps in plywood production in an excel chart with a list of production steps that does not conform to any particular sources on the record.  *See* DH Respondents' Revised Cmts. at 29-30, **P.R.138, C.R.134**.  Instead, Commerce argues that it cannot rely on any company's specific production process but must "holistically" view multiple sources.  Nevertheless, Commerce's decision and reasoning to incorporate or omit production steps from multiple sources must be clearly discernable to interested parties and to the Court.

Third, Commerce erred in counting the initial steps of harvesting logs, transporting logs, [                                    ], and debarking the logs as the four initial steps of two-ply panel production in China and finished plywood production in China.  These steps are not specific to plywood production, but are the starting point to produce any wood based products.  *Id.* at 36-37. Nor are these steps performed during *core veneer production* based on Chengen's experience. *Id.*  Moreover, Commerce points to a document submitted by Finewood titled "Plywood Manufacturing Process in A Chinese Plywood Factory" by Yalong Wood as supporting evidence, where the diagram begins with "Plantation Timber," "Log Preparation," and

"Debarking.  Final Scope Ruling at 36; Finewood SQR Part IV at Exhibit SQ1-37.  Commerce

conveniently ignored the caption above and below the diagram.  *Id.* (Right above the diagram,

the company states that "[p]ywood production process: veneer peeling, drying, glue spreading,

….."; right below the diagram, it states that the article "explains the calibrated plywood

manufacturing process in a typical plywood factory in China," with the first step listed below as

"Log Cutting," the second step being veneer peeling).  Chengen's production experience and Ya

Long Wood's article are specific to plywood production in China, and both start with cutting

logs.  *Id.* at Exhibits SQ1-37 (Ya Long article) & SQ1-38 (Chengen Production Flowchart).

Next, Commerce counted a step "[                    ]" as part of the two-ply production

in China and hardwood plywood production in China.  Prelim. Analysis Memo at Att. 4.

Commerce does not explain how it determined that this is a necessary step and the record

evidence supporting the production step.  Further, this step is listed right before "[

]," so presumably this means [                                              ],

but such a minor step is regarded as part of the gluing process, not stand-alone production steps,

of Finewood's.  *Id.*  For a fair comparison, Commerce should have added two additional

"[          ]" steps to Finewood's production process or remove them from the China two-ply

production steps and China plywood production steps.

Lastly, Commerce ignored all record evidence analyzed by Finewood showing that the

production process in China of two-ply panels imparts none of the essential characteristics to the

final hardwood plywood that make the product marketable and usable to plywood consumers.

*See* Finewood SQR Part IV at 25-31.  Commerce also never discussed the photos of two *core*

veneer factories in China showing an extremely straightforward process with no sophisticated

process required.  *See* Finewood Apr. 30 Rebuttal at 8-10 & Exhibit 1 (photographs are included

in Exhibit 1's attachment), **P.R.100, C.R.125**.  Instead, Commerce unconvincedly argued that debarking of logs is a labor-intensive process, and slicing veneers requires highly sophisticated equipment.  *See* Final Scope Ruling at 36; Prelim. Scope Ruling at 23-24.

Plaintiffs have discussed above that debarking log is not a process specific to plywood production.  The overall weight of the evidence on the record indicates that plywood manufacturers in China do not generally carry out the process of debarking logs.  While it is true that Chengen debarks some of its logs by hand, Commerce's verification report stated that "{w}e observed **a worker** hand scraping bark off logs. Company officials explained that the **birch logs are received in good quality, and only some need to have bark scraped off, as others arrive with minimal to no bark**. We observed that some of the logs did not need to be debarked." Finewood Sur-Rebuttal at Exhibit SR-3, p. 13, **P.R.107, C.R.127**. {Emphasis Supplied}. Chengen's statement that "only some need to have bark scraped off," accompanied by that: (1) Chengen had "**a** worker" debarking logs, and (2) Chengen does not consider debarking of logs one of its production steps (as it is not listed in Chengen's production flowchart), strongly suggest that Chengen does not routinely receive large quantities of logs that need to be debarked. There is also no discernable connection between Commerce's observation that a worker was debarking logs by hand and the conclusion that debarking logs is labor-intensive and resource-intensive.  Finewood undertook several production steps in Vietnam (such as puttying) that are done by hand and which Commerce did not count as labor-intensive and resource-intensive steps.

The other record evidence citation provided by Commerce was to Petitioner's Rebuttal Factual Information Response Exhibit 1.  *See* Prelim. Scope Ruling at 24 & FN 141.  As Finewood discussed in its comments, the plywood production process described by a UK

company that advertises itself as a distributor of materials, electronic kits, microbits & accessories, e-textile and conductive thread, robotics, and components and has little relevance to the plywood production process in China and in Vietnam.  *See* DH Respondents Revised Cmts. at 35-36.

Further, Commerce's argument that Chengen's bill of materials (BOM) submitted in POR 1 demonstrates that veneers are produced by equipment that is calibrated to specific and extremely precise sizes is misplaced.  *See* Final Scope Ruling at 36 (citing to Preliminary Scope Ruling at 24).  Finewood has fully refuted Commerce's notion that sophisticated equipment is needed to slice veneers.  *See* DH Respondents Revised Cmts. at 37-38; Chengen POR1 Records at Exhibit AI-5 (Chengen Section D Supplemental Response at Exhibit SQ3-24), **P.R.62-84, C.R.25-96.**  Commerce countered in its Final Scope Ruling that Finewood failed to cite to any record document where, in fact, Finewood cited to the *same exact* document to which Commerce referred and, in fact, Finewood's discussion is based on the drawings and narrative instructions contained in that document.  Final Scope Ruling at 36.  Critically, Commerce considered the degree to which the veneer peeling machinery is tuned even though the referenced Chengen's exhibit makes no mention of veneer peeling machine. *See* Chengen's Exhibit SQ3-24.  And not a single page in this exhibit supports Commerce's argument that "veneers are produced on equipment that is calibrated to specific and precise sizes with finished product tolerance of as little as only [        ] mm per ply."  Prelim. Scope Memo at 24.  Rather, the tolerance of the finished plywood is gained by properly connecting several core sheets horizontally, laying several core sheets and face/back sheets together vertically, gluing in several stages, hot and cold pressing in several stages, patching, trimming and sanding the unfinished and then the finished plywood in several stages.  *See* Chengen's Exhibit SQ3-24.  Finewood undertook all of these

production steps in Vietnam.  *See* Finewood SQR Part IV at 24, 26-31 and Ex.SQ1-38 and SQ1-39, **P.R.91-92, C.R.117-123**; Finewood SQR Part I at Ex. SQ1-8, **P.R.59, C.R.14-24**; Finewood SQR Part II at 3-4, **P.R.85-90, C.R.97-116**. Commerce's own analysis on sophistication of the plywood production process confirms that Commerce also must also conclude that Finewood's production process is highly sophisticated and comprehensive in nature.

For the reasons above, Commerce's analysis of the "Vietnam Plywood Production" must be revised by adding the four Finewood production steps omitted; removing the first four steps and the "[                    ]" step in "China Two-Ply Production" and "China Plywood Production."  *See* Prelim. Analysis Memo at Att. 4.  In that case, Finewood's production in Vietnam of finished plywood from two-ply panels involves [    ] steps, compared to the [  ] steps to produce two-ply panels in China or [   ] steps to produce finished plywood in China.  This comparison indicates that the nature and sophistication of the processing that occurs in Vietnam is twice as intensive compared to the two-ply processing and is very similar to the entire plywood production in China, consistent with the comparison between Finewood's own production process and Chengen's production process that Finewood has described.

### 5.  Finewood's Value-Added in Vietnam is Substantial.

Commerce begins its value-added analysis by applying a surrogate value in China to the cost of purchasing single veneer sheets for the production of two-ply.  This methodology directly contradicts Commerce's analysis of the nature and sophistication of two-ply production in China, which began with the harvesting of logs.  Commerce attempts to explain this methodological inconsistency by invoking yet again the hypothetical concern that this might incentivize Finewood to select a trade/reseller as the comparison point for the production process analysis.  Final Scope Ruling at 38-39.  As discussed above in the "natural/sophistication of production

processing" section, Commerce cannot base its methodological choice on hypotheticals that ignore the facts in this case.

Moreover, in analyzing the value-added factor, Commerce used Chengen's data to calculate the cost for two-ply panels but modified the application of surrogate values ("SV") to an intermediate product (i.e., veneers) instead of the raw materials Chengen actually consumed (i.e., logs). *See* DH Respondents' Revised Cmts. at 31-33 & 39-40 (citing cases including *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) in rebuttal to Commerce's Preliminary Determination that it cannot assume Chengen's production process or consumption rates are representative of the two-ply panel producers in China).  In the Final Scope Ruling, Commerce insists that Chengen's dumping margin not reasonably reflective of the separate rate companies' potential dumping margin.  Final Scope Ruling at 39 (citing *Linyi Chengen Imp. & Exp. Co. v. United States*, Slip Op 21-127 (CIT September 24, 2021) ("*Linyi Chengen IV*")).  Commerce's argument is untenable because *Linyi Chengen IV* arose from litigation of the AD investigation, not POR 1 administrative review.  Further, the question of whether Chengen's 0% rate from the AD investigation is representative only became a contestable issue because Chengen's rate was 0% and the other mandatory respondent's rate was based on adverse facts available ("AFA").  *Linyi Chengen IV*, Slip Op 21-127, at 10-11.  In AD POR 1, Chengen was the *sole* mandatory respondent and was assigned a rate above *de minimum*. *See Certain Hardwood Plywood Products From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 77,157 (Dec. 1, 2020) (assigning Chengen's calculated rate to all SRA companies).  Therefore, Chengen's data in POR 1 *per se* accurately reflected those of other producers in China, where the producers of

Finewood's two-ply panels are located, and Commerce cannot arbitrarily depart from Chengen's production process while using Chengen's consumption to construct the cost of two-ply.

Moreover, in *Linyi Chengen III* and prior litigation, the Court reversed Commerce's intermediate input methodology to value Chengen's plywood production from veneers instead of logs. *Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349, 1353-54 (Ct Int'l Trade 2020) (providing factual background that in the investigation, Commerce initially decided to apply an intermediate input methodology because it found that Chengen's log consumption calculations inaccurate, which the Court ultimately decided as unsupported by evidence). Unlike the *Linyi Chengen* cases, in this scope ruling, Commerce decided to apply an intermediate input methodology based on no evidence at all, simply stating that because it "know[s] nothing about the production processes of Finewood's Chinese suppliers..." Final Scope Ruling at 38. Commerce's decision must be rejected.

Notably, Commerce stated that it prefers the actual two-ply panel's FOPs, Finewood's FOPs, and Finewood's Vietnamese toller's FOPs for cost calculations. *Id.* However, the record does not contain such information and it is no fault of Finewood's. Had CBP, upon receiving Finewood's first EAPA questionnaire response, made a prompt scope referral, and had Commerce requested FOP data promptly instead of waiting for another year and half after receiving CBP's scope referral, Finewood could have provided its own FOPs and would have had much better chances of obtaining FOPs from the unaffiliated two-ply suppliers and local tollers.

Another reasonable alternative for Commerce to value the two-ply from China is to apply SVs directly to the two-ply Finewood purchased. In circumvention inquiries, Commerce

routinely applies SVs of the input materials directly to it, as exported from the non-market economy ("NME") country  to the third country.  *Second Redetermination Pursuant to Court Remand Order in Bell Supply Co., LLC v. United States*, Ct, No. 14-00066 (Dep't Commerce Aug. 11, 2016) at 29 (stating that it is Commerce's normal practice to measure the value of subject merchandise from NME countries based on SVs).  The Malaysia SVs for poplar two-ply from China is on the record, and Commerce can easily derive the estimated cost of two-ply by multiplying the total consumption quantity (i.e., 330.13 USD/M3 * [            ] M3).  *See* Finewood SQR Part III at Exhibit SV-1; Prelim. Analysis Memo at 2.

Second, Commerce cited the fact that not all of the two-ply producers', Finewood's, and Finewood's local toller's actual consumption data is on the record as reason to continue using Finewood's U.S. sales price as the denominator instead of an FOP buildup.  Final Scope Ruling at 39-40.  However, Commerce does not discuss that the record contains the main material inputs' consumption data.  Specifically, Finewood's consumption quantities of [

                                                ] are actual data derived from production records; for the two-ply sourced from China, the consumption data is based on Chengen's data, as discussed above; for the locally-tolled core veneer platforms, Finewood submitted the actual consumption data (other than labor hours). Therefore, the only missing consumption data is Finewood's auxiliary materials, energy, labor, as well as Finewood's local tollers' labor consumption rates.  *See* Finewood SQR Part IV at 31-32.

Chengen's FOPs of auxiliary materials, energy, labor are suitable proxies for production occurring in Vietnam.  In particular, Finewood's production process is similar to that of Chengen's, and both factories employ a "two-step" production process of plywood. *See id.* at Ex.

SQ1-38 (Chengen's production flowchart) and Finewood SQR Part I at Exhibit SQ1-8
(Finewood's production flowchart).

Additionally, Commerce criticized Finewood's reported total cost of production in
Vietnam of being distorted because not all of Finewood's plywood used two-ply panels from
China.  Final Scope Ruling at 40.  Finewood has addressed this concern prior to the Preliminary
Scope Ruling by removing the CONNUMs where 2-ply panels were not used, which changed
Finewood's value-added percentage from 64.61% to 58.42%, which is still significant.  *See*
Finewood Sur-Rebuttal Comments (May 13, 2021) at 14-15 & Exhibit SR-4, **P.R.107, C.R.127**;
*Peer Bearing III*, 128 F. Supp. 3d at 1296 (finding that 38% of the value-added supported a
finding of substantial transformation).

Moreover, the Finewood U.S. sales list used by Commerce to derive the finished
plywood U.S. sales value [                                          ].  *See* Finewood SQR Part I at 13 &
Exhibit SQ1-12, **P.R.59, C.R.14-24**.  In this exhibit, the first two columns to the left following
the S/N number are "Exporters" and "Invoice Title."  *Id.* (Finewood [

]).  In the initial questionnaire response, Finewood reported its affiliated companies
including the [                                                    ] and their company
activities.  *See* Finewood QR at Exhibit 3, **P.R.26, C.R.3**.  In its supplemental questionnaire
response, Finewood further explained that [

].

*See* Finewood SQR Part I at 3.  Therefore, the "Total Value USD" column in Exhibit SQ1-12 are
payments that Finewood received, as tied to Finewood's books and records.  However, these
USD values in Exhibit SQ1-12 [

].

In light of the above, Plaintiffs submit that the Court should find Commerce's value-added calculation unsupported by substantial evidence and arbitrary and capricious. The most reasonable methodology to calculate Finwood's value-added is the calculation provided in Finewood's supplemental questionnaire response, with a revision removing certain CONNUMs of plywood that do not contain two-ply, lowering the Vietnam processing value-added to **58.42%**.

> ### 6. The Level of Investment Factor Weighs In Favor of Finding Substantial Transformation.

Commerce used Chengen's data as a comparative reference; Plaintiffs concur. Final Scope Ruling at 42-43; Prelim. Scope Ruling at 30-31. However, Commerce's determination that the "level of investment required to produce two-ply panels in China is greater than the level of investment required to assemble the two-ply panels into finished plywood in Vietnam" is unsupported by substantial evidence for the reasons below.

In the proceeding before Commerce, Finewood analyzed its and Chengen's capital investment, equipment and machinery investment, cost of production, number of employees and labor hours. *See* Finewood SQR – Part IV at 35-38 & Exhibit SQ1-42 (Summary – Level of Investment Comparison). The comparison suggests that Finewood's level of investment exceeds Chengen's investment in some aspects and is comparable to Chengen's investment in others. *Id.* Commerce refused to directly compare Chengen's investment (approximately $[    ] million) with Finewood's (approximately $[    ] million). Prelim. Scope Ruling at 31. Instead, Commerce derived an investment-to-sales amount for each company based on the sales volume

of each for the months that Finewood operated, finding that Finewood's investment amounts to

$[    ]/m3 while Chengen's amounts to $[    ]/m3.  *See* Prelim. Scope Ruling at 31.

      The Court should find this calculation unreasonable because the sales volume provides no

information on the true application of the companies' investments without the companies'

capacity information.  *See* DH Respondents Revised Cmts. at 41-42. Plaintiffs thus proposed a

more reasonable alternative by using only the sales volume of both companies' busiest month.

Commerce calculated it to be Finewood – [    ]/M3 and Chengen – [    ]/M3, but still

rejected this approach, claiming "nothing is on the record to suggest that sales volume for the

highest sales month is in any way representative of production capacity."  Final Scope Ruling at

43.  Commerce's analysis is misplaced.  Plaintiffs do not argue that the sales volume from the

highest sales month *in fact represents* the companies' actual capacity, instead, Plaintiffs argue

that that sales volume represents the companies' capacity *more closely* and is therefore a better

comparison.

      Commerce seemingly agreed with Finewood's calculation of equipment and machinery

(i.e., Finewood – [    ] and Chengen – [    ]).  *See* Prelim. Analysis Memo at Att. 5,

**P.R.111, C.R.129-130**.  In the Preliminary Scope Ruling, Commerce did not separately analyze

"initial capital" and "equipment and machinery" as Finewood did, but instead grouped them

together into "total investment."  *Id.*  Finewood does not object to this.  With respect to number

of employees, Commerce used Finewood's calculation of employees (i.e., Finewood – 127 to

184 employees, Chengen – 134 to 427 employees).  Prelim. Scope Ruling at 31.  Although

Commerce stated that on the higher end, Chengen's employee number is more than twice as

much as Finewood's, Commerce also does not dispute that the companies' employee number on

the lower end is very comparable. *Id.* Commerce further agreed with that Finewood's employee

range is somewhat understated because Finewood outsourced a substantial amount of core platform production to local tollers while Chengen performed all production steps for all hardwood plywood itself, but unreasonably found the employee numbers do not provide an appropriate basis for comparison.  *Id.* (citing Finewood's SQR Part IV at 37).

Thus, Commerce's level of investment analysis in the Preliminary Scope Ruling entirely hinged on the "investment per sales volume" comparison discussed above and was unchanged in the Final Determination.  Because the sales volume in the busiest months more closely resembles the company's production capacity, the Court should find Finewood-proposed investment calculation (i.e., Finewood – [          ]/M3 and Chengen – [          ]/M3) more reasonable than Commerce's investment calculation (i.e., Finewood – [          ]/M3 and Chengen – [          ]/M3).

Critically, the test is whether Finewood's plywood production is significant as compared to Chengen's, not whether Finewood's plywood production is *more* significant than Chengen's.  "Nowhere does Commerce state that in order to constitute a substantial transformation, the level of investment for the processing of unfinished OCTG must be equal to or greater than the cost of investing in a complete pipe mill."  *Id.* at 1296. As the Court has found, the level of investment criterion cannot be evaluated in a vacuum, and it is reasonable for Commerce to compare the investment of the third-country processor to investment of an integrated producer.  *Bell Supply V*, 348 F. Supp. 3d at 1295-96.  Thus, the proper question is whether Finewood's level of investment in Vietnam is significant as compared to Chengen's investment, and the answer is "yes."  As such, the "level of investment" criterion weighs in favor of finding substantial transformation.

In this case, Commerce's five criteria of the substantial transformation, viewed together, weigh in favor of finding that substantial transformation occurred when Finewood produced finished plywood from two-ply raw materials.  Therefore, the Court should find that production of the two-ply panels in Vietnam into hardwood plywood results in a substantial transformation, and the proper country of origin of Finewood's plywood is Vietnam.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs Finewood, FEA, and Liberty request that the Court reverse Commerce's scope determination issued in the Final Scope Ruling.

Respectfully submitted,

/s/ *Gregory S. Menegaz*

Gregory S. Menegaz
J. Kevin Horgan
Alexandra H. Salzman
Vivien Jinghui Wang
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs Vietnam Finewood Company Limited, Far East American, Inc., and Liberty Woods International, Inc.*

Date: August 15, 2022

\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

\*\* Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**


This brief has been prepared utilizing Microsoft Word 2021 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **<u>13,968</u>** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.


/s/ Gregory S. Menegaz
_____
Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 410
1090 Vermont Ave., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiffs*