NON-CONFIDENTIAL VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE BEFORE:

THE HONORABLE MARK A. BARNETT

| | |
|---|---|
| ————————————————— ) | |
| INTERGLOBAL FOREST, LLC ) | **NON-CONFIDENTIAL VERSION** |
| ) | |
| Plaintiff, ) | |
| v. ) | Ct No. 22-00049 |
| ) | (Consolidated w/No. 22-00053) |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ————————————————— ) | |

**CONSOLIDATED PLAINTIFF INTERGLOBAL FOREST, LLC RULE**

**56.2 MEMORANDUM IN SUPPORT OF MOTION FOR**

**<u>JUDGMENT UPON THE AGENCY RECORD</u>**

Thomas H. Cadden
Ignacio J. Lazo
**CADDEN & FULLER, LLP**
2050 Main Street
Suite 260
Irvine, CA 92614
*Counsel to Plaintiff*

Dated: August 16, 2022

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

     A.    Identification Of The Parties And The Initial Proceedings.....................................1

     B.    Frustrated By The Restrictive Scope Of The Definition Which Commerce
         Had Initially Adopted, CBP Sought Succor Through The Transparent Ruse
         Of Inviting Commerce To Revisit And Expand Retroactively The Scope Of Its
         Initial Unequivocal Definition Of "Covered Merchandise."……………...………1

II.   STATEMENT OF THE CASE .........................................................................................3

     A.    The Scope Of The Initial Orders Clearly Excluded Any Type Of Panel Which
         Did Not Consist Of At Least Two Plies And A Core ............................................3

     B.    At The Invitation Of CBP, Commerce Abused Its Discretion By Contriving To
         Find An Ambiguity Which Was Clearly A Post Hoc Rationalization Designed
         To Allow CBP To Claim That The Particular Two-Ply Panels Utilized
         By Finewood Constituted "Covered Merchandise."………………………….…4

III.  RULE 56.2 STATEMENT .........................................................................................8

     A.    Administrative Determinations Subject to Appeal ................................................8

     B.    Issues Presented………………………………………………………………..9

IV.   STANDARD OF REVIEW .........................................................................................9

     A.    Arbitrary and Capricious Standard .....................................................................10

V.    SUMMARY OF ARGUMENTS .........................................................................................11

     A.    On Their Face, The Orders Only Encompassed Imports of Panels Made with
         Three or More Veneers .........................................................................................11

     B.    The Interpretation Which Commerce Attempts To Place On The Language At
         Issue Strains The Scope Of The Orders Beyond Their Elastic
         Limit ………………………………………………………………………………11

NON-CONFIDENTIAL VERSION

C.      The Two-Ply Panels Imported from China are *Not* "Plywood." ..................12

D.      The Two-Ply Veneers Were Substantially Transformed in Vietnam. ..............13

VI.    ARGUMENT REGARDING INCLUDING TWO-PLY PANELS IN THE SCOPE
       ORDER ........................................................................................................... 13

A.      Commerce Impermissibly Expanded the Unambiguous Scope of the Orders......14

B.      The Orders Do Not Purport to Apply to All Veneers Which Adhere to Each
        Other. ...........................................................................................................14

C.      Purporting to Find an Ambiguity of Its Own Creation, Instead of Initiating a
        New Rulemaking Process Subject to the Protections of Notice and Procedural
        Due Process, Commerce Unilaterally And Improperly Expanded the Scope
        of Its Definition...............................................................................16

D.      The Petitions and Revisions to the Scope Language Prior to Initiation Reflect
        That Two-Ply Panels Were Not Within the Scope of the Orders And In Fact
        Were Specifically Removed From the Scope of the Orders........................17

E.      Utilization of Two-Ply Panels was an Inevitable Consequence of the
        Definition Commerce Elected to Employ, And It Should Not be Permitted to
        Entrap Manufacturers and Importers Who Adhered to the Definitions and Rules
        By Unilaterally Changing the Interpretation of the Scope of the Orders...........19

F.      Even If the Scope Language Was Ambiguous, Commerce Incorrectly Interprets
        the Scope to Include Two-Ply Panels. ...........................................20

VII.   ARGUMENT SUBSTANTIAL TRANSFORMATION OF THE TWO-PLY PANELS ..23

A.      Because the Two-Play Panels Were Substantially Transformed in Vietnam,
        China is Not the Country of Origin for the Resulting Plywood. .........................23

B.      Applying The Five Factor Test Demonstrates That the Two-Ply Panels
        Were Substantially Transformed in Vietnam. ......................................24

C.      Some Of the Hardwood Plywood Which IGF Purchased From Finewood Was
        Not Produced Using Two-Ply Cores And Therefore Must Be Excluded From
        The Scope Determination..............................................................43

D.      Analysis Under Notice of Final Determination of Sales at Less Than Fair
        Value Compels the Conclusions That Substantial Transformation
        Occurred in Vietnam .............................................................................44

NON-CONFIDENTIAL VERSION

E.   IGF Undertook Extensive Efforts to Verify That Finewood Possessed Sufficient Technology and Capacity to Produce the Plywood IGF Purchased …………..………………………………..………………………..46

VIII.   CONCLUSION .................................................................................................................49

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**CASES**

1.  *AG der Dillinger Hüttenwerke, et. al. v. United States*, Consol. Court No. 17-00158, Slip Op. 21-102, dated August 18, 2021..........................................................................36

2.  *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016) …………………………………………………………..38, 39

3.  *Allegheny Bradford Corp, d/b/a Top Line Process Equipment Company v. United States,* 28 C.I.T. 830 (Ct. Int'l Trade June 4, 2004) …………………………22, 23

4.  *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014) ........................10

5.  *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004) ....................................10

6.  *Bell Supply Co., LLC v. United States,* 888 F.3d 1222 (Fed. Cir. 2018)………..23, 24, 42

7.  *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018)………………………………………………………37, 41, 42

8.  *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019)………………………………………………………..24, 25

9.  *Bestfoods v. United States,* 165 F.3d 1371 (Fed. Cir. 1999)...........................................23

10. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974) ……………………………………………………… 9, 10

11. *Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262, 1265 (Fed. Cir. 2004) …………………………………………………………..27, 28

12. *Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018) ……………………………… 11, 13. 14, 15, 18

13. *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018) …………1, 5, 9, 11, 13

14. *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) …………………………………………………………..9, 10

NON-CONFIDENTIAL VERSION

15. *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017) ........................................................................................38

16. *CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-1381 (Fed. Cir. 2016) .....10

17. *Diamond Tools Tech. LLC*, 2021 Ct. Intl. Trade LEXIS 155...........................................46

18. *Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ……………………………………………………………………20, 21, 22, 23, 25

19. *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) ………………2, 21

20. *Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp. 3d 1373, 1378 (Ct. Int'l Trade 2020) ........................................................................................25

21. *FTC v. Standard Oil Co.*, 449 U.S. 232, 245 (1980). …………………………………....8

22. *Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (Ct. Int'l Trade 2017)…………………………………………………………………..19, 20

23. *Kahrs Int'l v. United States*, 713 F.3d 640, 645 (Fed. Cir. 2013) …………………..27, 28

24. *Meridian Prods., LLC v. United States*, 890 F.3d 1272 (Fed. Cir. 2018) .......................25

25. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ..10

26. *Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina*, 58 F.R. 37062-01, 1993 WL 248 (F.R.) (Dep't. Comm. July 9, 1993) ........................................................44

27. *Peer Bearing Co.-Changshan v. United States*, 128 F. Supp. 1286 (Ct. Int'l Trade 2015) ……………………………………………………………………7, 31

28. *Russell Stadelman & Co. v. United States*, 242 F.3d 1044 (Fed. Cir. 2001) ..................27

29. *Timber Products Co. v. United States*, 515 F.3d 1213 (Fed. Cir. 2008) …………………………………………………………………..27, 28

30. *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) ................................10

31. *U.K. Carbon & Graphite Co. v. United States*, 931 F. Supp. 2d 1322 (Ct. Int'l Trade 2013)........................................................................................38

32. *Whirlpool Corporation v. United States*, 890 F.3d 1302 (Fed. Cir. 2018)………………14

NON-CONFIDENTIAL VERSION

**REGULATIONS**

1.  5 U.S.C. §704........................................................................................................8
2.  5 U.S.C. §706(2)(A) ...........................................................................................9
3.  19 C.F.R. § 165.1…………………………………………………………46, 47
4.  19 CFR § 351.225(k)(1) ……………………………………………….5, 18, 28
5.  19 CFR § 351.225(k)(2)….. ………………………………………………….28
6.  19 U.S.C. §1517(a)(3) .........................................................................................1
7.  19 U.S.C. § 1517(a)(5)........................................................................................46
8.  19 U.S.C. § 1517(a)(5)(A) ……………………………………………….47, 51
9.  19 U.S.C. § 1517(b)(4)(A)....................................................................................1
10. 19 U.S.C. §1517(g)(2) .........................................................................................9

**ADMINISTRATIVE DECISIONS**

1.  Certain Hardwood Plywood Products from the People's Republic of China: Amended
    Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order,
    83 Fed. Reg. 504 (Dep't Commerce Jan. 4, 2018)..............................................1

2.  Certain Hardwood Plywood Products from the People's Republic of China,
    Countervailing Duty Order, 83 Fed. Reg. 513
    (Dep't Commerce Jan. 4, 2018)...........................................................................1

NON-CONFIDENTIAL VERSION

## I.   INTRODUCTION

### A.  Identification Of The Parties And The Initial Proceedings.

Consolidated Plaintiff InterGlobal Forest, LLC. ("IGF") or ("Plaintiff") is a U.S. importer of hardwood plywood manufactured by Vietnam Finewood Company Limited ("Finewood"). Finewood is a privately held company organized under the laws of Vietnam.  Finewood produces hardwood plywood in Vietnam and exports such hardwood plywood to the United States.  Far East American, Inc. ("FEA") and Liberty Woods International, Inc. ("Liberty") are other interested third parties.  All three are U.S. importers of hardwood plywood manufactured by Finewood in Vietnam.

On January 4, 2018, the U.S. Department of Commerce ("Commerce") imposed an antidumping duty ("AD") order and a countervailing duty ("CVD") order on U.S. imports of Chinese hardwood.  *See, Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 504 (January 4, 2018) (the "AD Order"); *see also Certain Hardwood Plywood Products from the People's Republic of China*, 83 Fed. Reg. 513 (January 4, 2018) (the "CVD Order") (collectively, the "Orders").  The merchandise that is subject to the Orders is referred to herein as "Covered Merchandise."  *See* 19 U.S.C. §1517(a)(3).

### B.  Frustrated By The Restrictive Scope Of The Definition Which Commerce Had Initially Adopted, CBP Sought Succor Through The Transparent Ruse Of Inviting Commerce To Revisit And Expand Retroactively The Scope Of Its Initial Unequivocal Definition Of "Covered Merchandise."

U.S. Customs and Border Protection ("CBP") was unable to determine whether certain merchandise at issue was within the scope of the AD Order A-570-051 and CVD Order C-570-

1

NON-CONFIDENTIAL VERSION

052 with respect to certain hardwood plywood from the People's Republic of China.  Therefore, in accordance with the procedures of 19 U.S.C. § 1517(b)(4)(A), CBP referred the matter to Commerce on September 16, 2019.  More particularly, CBP requested that Commerce issue a determination as to whether certain two-plywood-on-wood hardwood products produced by Finewood ("two-ply panels") were covered merchandise subject to the Orders.  *See*, Trade Remedy Law Enforcement Directorate's ("TRLED"), EAPA Cons. Case No. 7252: Notice of Determination as to Evasion (Jan. 28, 2022) at p. 5 and FN 23 (the "Determination").  As a result of the covered merchandise referral, the deadlines in the EAPA investigation were stayed pending Commerce's issuance of the Determination.  *Id.*, at p. 5 and FN 24.

On January 21, 2022 Commerce's final scope determination was issued concerning the AD and CVD Orders on hardwood plywood from the People's Republic of China.  *See* Memorandum from Nicolas Mayora. International Trade Analyst, Office V, AD/CVD Operations to James Maeder, Deputy Assistant Secretary for AD/CVD Operations Regarding Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China, Enforcement and Protect Act ("EAPA") Investigation No. 7252, Final Scope Ruling (January 21, 2022) (the "Scope Ruling"). See PR-141, CR-135. "PR" refers to the Antidumping Public Record, ECF No. 23-1; "CR" to the Antidumping Confidential Record, ECF No. 23-2.

In its final Scope Ruling, Commerce improperly concluded that the two-ply panels were covered by the scope of the Orders.  In its analysis of the scope language, Commerce ignored the fact that the scope language states that "certain veneered panels" are defined in the scope text and then the text defines "other veneered panels" as having a minimum of three plies.  The Federal Circuit emphasized the general rule that "Commerce cannot 'interpret' an antidumping order so as

2

to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms."[1]  Here, Commerce is doing that which is specifically prohibited.  There is no claim that language of the Orders covers the two-ply panels.  Commerce is unilaterally changing the scope of the Orders or, at a minimum, interpreting the Orders in a manner contrary to their plain language.

In addition to erroneously determining that two-ply panels came within the scope of the Orders, Commerce also concluded incorrectly that none of the factors in the substantial transformation analysis weighed in favor of finding that the two-ply panels had been substantially transformed.  *Id.*, at p 5, FN 27.  Consequently, the Scope Ruling issued by Commerce wrongly concluded that country of origin of the resulting hardwood plywood was China.  Scope Ruling, p. 5, FN 28.

For the reasons articulated above and based upon the further facts and legal arguments detailed below, the findings of Commerce that the two-ply panels are included as Covered Merchandise in the Orders and that the two-ply panels were not substantially transformed into plywood in Vietnam lack foundation and must be reversed.

## II.    STATEMENT OF THE CASE

### A.    The Scope Of The Initial Orders Clearly Excluded Any Type Of Panel Which Did Not Consist Of At Least Two Plies And A Core.

Commerce published its AD and CVD Orders on U.S. imports of hardwood plywood from China on January 4, 2018.  Commerce defined the scope of the Orders as follows:

---

[1] *Id.* at 1095 *quoting Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001).

NON-CONFIDENTIAL VERSION

The merchandise subject to this investigation is hardwood and decorative plywood, and certain veneered panels as described below. For purposes of this proceeding, hardwood and decorative plywood is defined as a generally flat, multilayered plywood or other veneered panel, **consisting of two or more layers or plies of wood veneers <u>and</u> a core,** with the face and/or back veneer made of non-coniferous wood (hardwood) or bamboo. The veneers, along with the core may be glued or otherwise bonded together. Hardwood and decorative plywood may include products that meet the American National Standard for Hardwood and Decorative Plywood, ANSI/HPVA HP-1-2016 (including any revisions to that standard).

For purposes of this investigation a "veneer" is a slice of wood regardless of thickness which is cut, sliced or sawed from a log, bolt, or flitch. **The face and back veneers are the outermost veneer of wood on either side of the core** irrespective of additional surface coatings or covers as described below.

**The core of hardwood and decorative plywood consists of the layer or layers of one or more material(s) that are situated between the face and back veneers.** The core may be composed of a range of materials, including but not limited to, hardwood, softwood, particleboard, or medium-density fiberboard (MDF).

*Id.* at Appendix. {Emphasis added}.

On its face, the scope of the Orders makes it clear that the subject merchandise <u>must</u> consist of at least two plies *<u>and</u> a core*. A two-ply panel is not within the face of the scope of the Orders.

NON-CONFIDENTIAL VERSION

**B.   At The Invitation Of CBP, Commerce Abused Its Discretion By Contriving To Find An Ambiguity Which Was Clearly A Post Hoc Rationalization Designed To Allow CBP To Claim That The Particular Two-Ply Panels Utilized By Finewood Constituted "Covered Merchandise."**

On January 13, 2020, Commerce initiated a scope inquiry, allegedly based on CBP's scope referral (although Commerce erroneously indicated in its initiation notice that the scope inquiry was "self-initiated").  *See* Dep't Commerce, *Certain Hardwood Plywood From the People's Republic of China: Notice of Covered Merchandise Referral and Initiation of Scope Inquiry*, 85 Fed. Reg. 3024 (January 17, 2020) (the "DOC Notice").

In its final Scope Ruling, Commerce improperly concluded that two-ply panels were covered by the scope of the Orders.  Commerce found that the Orders cover two general types of merchandise: (1) hardwood and decorative plywood, and (2) "certain veneered panels."  Although the scope defines "hardwood and decorative plywood," the scope does not separately define "certain veneered panels" beyond including them within the clear scope of the language asserting that "multilayered plywood or other veneered panels" must consist of **"two or more layers or plies of wood veneers _and_ a core. . . ."**  [Emphasis added.]  In its analysis of the scope language, Commerce ignored the fact that the scope language states that "certain veneered panels" are defined in the scope text and then the text defines "other veneered panels" as having a minimum of three plies.

Having contrived to create an ambiguity in the scope language where none previously existed, Commerce proceeded to analyze the factors and source materials included in 19 CFR §

NON-CONFIDENTIAL VERSION

351.225(k)(1) ("(k)(1) materials").  In so doing, Commerce falsely claimed that it need consider only information that either Commerce or the parties put on the record.

Commerce rejected references in the case brief submitted on behalf of importers FEA and Liberty to (k)(1) materials from the original investigation which might inconveniently undermine its result- driven analysis.  These source materials include ''{t}he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.''  Commerce claimed that it was not obligated to consider the (k)(1) materials which would illuminate the intended purpose and scope of the Orders unless they were expressly incorporated in the administrative record of its current scope investigation.

Commerce also rejected the argument that the U.S. International Trade Commission ("ITC") did not investigate two-ply in its injury investigation, finding that no party placed the complete ITC Final Report on the record.  Despite the fact that the ITC defined the scope merchandise as consisting of a minimum of three plies, Commerce stated that the ITC also included "certain veneered panels" in its investigation, even though no party, including the Petitioner, Commerce, or the ITC ever identified "certain veneered panels" as potentially consisting of only two plies.

Although Commerce noted in its analysis that the ITC stated that a "plywood core" can be composed of only two plies, the scope of the Orders does not cover plywood cores as Subject Merchandise.  By cynically contriving to create a chimerical ambiguity (supposedly previously unnoticed by the ITC, IGF, *and Commerce itself*), Commerce thereby justified its bootstrap

NON-CONFIDENTIAL VERSION

assertion that it was entitled to rely on other analyses which are appropriate only in those cases where an actual ambiguity exists.

Thereupon, Commerce analyzed whether Finewood's two-ply panels imported from China were substantially transformed in Vietnam by Finewood's incorporation of the panels in its production of finished hardwood plywood.  Rejecting the substantial evidence that Finewood and the Importers put on the record of the case to show substantial transformation, Commerce concluded that the two-ply panels were not substantially transformed in Vietnam into a new product with a new name, character, and use.

In particular, in its substantial transformation analysis, Commerce improperly compared two-ply panels from China with the two-ply panels that Finewood used in the production of finished hardwood plywood in Vietnam. Commerce rejected the proper comparison of the upstream product - two-ply - with Finewood's downstream product – finished hardwood plywood composed of seven or more plies.

Hardwood plywood products are differentiated by species, quality of veneer (*e.g.* grade), thickness, number of plies, type of core (veneer, particleboard, MDF, or other), and the type of adhesive used in the manufacturing process.  Grades of hardwood plywood are determined by such things as number and size of knots, visible decay, splits or insect holes, surface roughness, and other defects.  Separate grades are assigned to both the face and back veneer.  Plywood with the highest face grades is used in applications where appearance is a primary consideration.  ITC Final Rpt. at I-14.

In the case of *Peer Bearing Co. – Changshan v. United States*, 128 F. Supp. 1286, 1299 (Ct. Int'l Trade 2015), the CIT questioned whether the upstream product had the same functional

7

NON-CONFIDENTIAL VERSION

or mechanical characteristics of the downstream product.  The CIT concluded that, because the upstream components required additional stages of processing to achieve the required dimensional tolerances and finish, Commerce could not find that the operations in the third country were limited to completion of the "unfinished" or "unassembled" downstream product.  *Id.* at 1302-1303.  This is the same as the relation between the two-ply panels to finished hardwood plywood.

Finewood's two-ply panels sourced from China possess not one of the above qualities that the Coalition members, the ITC, or Finewood and its customers report as decisive characteristics of plywood and important to plywood consumers. Two-ply is not [        ] thick, and includes no sanded face and back white birch veneer; two-ply is not finished poplar core with crossbands under the face and back; it is not putty filled nor has sanded edges; two-ply is not compliant with HPVA grading rules, and it is not CARB P2 certified. Two-ply panels therefore contain none of the dimensional, physical, or mechanical properties required of finished hardwood plywood.[2]

## III.    RULE 56.2 STATEMENT

### A.    Administrative Determinations Subject to Appeal

The Administrative Procedures Act ("APA") specifically provides that a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action," 5 U.S.C. §704.  *See, FTC v. Standard Oil Co.*, 449 U.S. 232, 245 (1980). The administrative determination subject to this appeal is:

---

[2]  See Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation dated April 20, 2021. See PR-91 and PR-92, CR-117 through CR-123.

NON-CONFIDENTIAL VERSION

1. The U.S. Commerce Department's final scope determination issued on January 21, 2022 concerning the AD and CVD Orders on hardwood plywood from the People's Republic of China. *See* Memorandum from Nicolas Mayora. International Trade Analyst, Office V, AD/CVD Operations to James Maeder, Deputy Assistant Secretary for AD/CVD Operations Regarding Antidumping Duty and Countervailing Duty Orders on Certain Hardwood Plywood Products from the People's Republic of China, Enforcement and Protect Act ("EAPA") Investigation No. 7252, Final Scope Ruling (January 21, 2022) (the "Scope Ruling").

**B.    Issues Presented**

Issue One: "The question arises as to whether the 2-ply cores of Chinese origin, which are further processed in Vietnam to include the face and back veneers of non-coniferous wood, are within the scope of the orders." *See* Dep't Commerce, Memorandum re: U.S. Customs and Border Protection Enforce and Protect Act Investigation No. 7252, Certain Hardwood Plywood Products from the People's Republic of China (A-570-051 and C-570-052); Placement of Covered Merchandise Referral Documents on the Record (Jan. 21, 2020) ("CBP Scope Referral").

Issue Two:  Did substantial transformation of two-ply panels take place in Vietnam when Finewood incorporated the two-ply panels it imported from China were incorporated in the finished hardwood plywood it produced and shipped to the U.S.?  Rejecting the substantial

NON-CONFIDENTIAL VERSION

evidence that Finewood and the Importers put on the record[3], Commerce erroneously concluded that Finewood's extensive manufacturing process in Vietnam did not cause the two-ply panels to lose their identity and result in their transformation into a new product with a new name, character, and use.

## IV.   STANDARD OF REVIEW

The EAPA provides for the standard of judicial review in 19 U.S.C. §1517(g)(2). Federal courts have recognized that the standard of review for international trade cases also encompasses the standards established under the APA, 5 U.S.C. §706(2)(A). *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (*citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

### A.  Arbitrary and Capricious Standard

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).  Internal inconsistency and self-contradiction do not satisfy

---

[3]   See Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation dated April 20, 2021 at 14-24 and Exhibits SQ1-28 through SQ1-35 (see PR-91 to PR-92, CR-117 through CR-123).

NON-CONFIDENTIAL VERSION

this requirement.  There must be "a rational connection between facts found and choices made," *Motor Vehicle Mfrs*, at 43.  Quite simply, there were no "facts found" as is required.

Further, the agency's rationale must address the parties' principal arguments.  *See, CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-1381 (Fed. Cir. 2016) (analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory justification for its determinations "as a reasonable implementation of statutory directives supported by substantial evidence").  In *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014) the Court underscored the importance of an agency's obligation to "articulate an explanation for its action," stating that "a fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action", citing *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001).  Finally, an abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

## V.    SUMMARY OF ARGUMENTS

### A.  On Their Face, The Orders Only Encompassed Imports of Panels Made with Three or More Veneers.

The Scope Ruling determined that two-ply panels imported by Finewood are covered by the scope of the relevant AD and CVD Orders on "certain hardwood plywood products from China."[4]  Because the plain language of the Orders requires that hardwood plywood, decorative

---

[4] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); and *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018) (collectively, the "*Orders*").

NON-CONFIDENTIAL VERSION

plywood, and the "other veneered panels" which were the subject of the Orders all required at least two plies and a core (a minimum of three layers of material), the Scope Ruling impermissibly expanded the scope of the Orders.

**B.  The Interpretation Which Commerce Attempts to Place on the Language At Issue Strains the Scope of the Orders Beyond Their Elastic Limit.**

The plain reading of the Orders *in context* is that the Covered Merchandise must have at least three layers.  The Orders state that the "merchandise covered by the *Orders* is hardwood and decorative plywood, and certain veneered panels *as described below*."[5]  The "as described below" language is not only instructive, but also mandatory.  Commerce cannot pluck the words "certain veneered panels" out and demand that the phrase stand alone when the Scope of the Order clearly requires it to be read and interpreted in context and ***in situ***.  "As described below" signals the upcoming description of the kinds of veneered panels encompassed by the Orders.

The description then proceeds to define the Chinese-made products which are the subject of the Orders as "a generally flat, multilayered plywood *or other veneered panel*."  (Emphasis added.)  In other words, after months of study and reams of comments, Commerce deliberately elected to employ the same definition for both hardwood plywood and other veneered panel.

The next sub-clause defines both types of plywood and "other veneered panel" as "consisting of two or more layers or plies of wood veneers and a core, with the face and/ or back veneer made of non-coniferous wood (hardwood)."[6]  This is the description of "certain veneered panels" that is signaled in the first sentence.  Thus, "certain veneered panels" and "other veneered

---

[5] *Id.*  [Emphasis added.]
[6] *Id.*

NON-CONFIDENTIAL VERSION

panel" mean, just as in the case of a product which is expressly labeled as plywood, a panel consisting of "two or more layers . . . and a core . . . with the face and/or back veneer made of non-coniferous wood. . . ."  The sub-clause makes clear that veneered panels must, like hardwood and decorative plywood, have at least three layers (two or more layers and a core).

The Orders then describe the veneer and the core in a consistent manner.  Both veneer and core are described as elements of veneered panels or plywood requiring at least three layers. Veneer is described as a "slice of wood . . . which is cut, sliced or sawed from a log, bolt, or flitch . . . [t]he face and back [of which] are the outermost veneer of wood on either side of the core. . ."[7] The core "consists of the layer or layers of one or more material(s) that are situated between the face and back veneers."[8]

### C.  The Two-Ply Panels Imported from China are *Not* "Plywood."

Commerce acknowledges that Finewood makes hardwood plywood "in Vietnam using two-ply panels imported from China."[9]  Commerce acknowledges that the face and back veneers of non-coniferous wood are added in Vietnam.  It states, the "two-ply panels of Chinese origin . . . are further processed in Vietnam to make hardwood plywood by adding the face and back veneers of non-coniferous wood."[10]  Thus, it is undisputed that, by definition, Finewood's finished hardwood plywood does not come from China.  It is undisputed that no three-ply product comes from China.  It is undisputed that only the two-ply panels come from China.  Lastly, it is undisputed that face and back veneers of non-coniferous wood are added in Vietnam during the plywood manufacturing process.

---

[7] *Id.*
[8] *Id.*
[9] *See,* Scope Ruling at p. 6, paragraph 1.
[10] *Ibid.*

13

NON-CONFIDENTIAL VERSION

**D.  The Two-Ply Veneers Were Substantially Transformed in Vietnam.**

The Scope Ruling determined that two-ply panels imported by Finewood are covered by the scope of the relevant AD and CVD Orders on "certain hardwood plywood products from China."[11]  Because the plain language of the Orders requires that hardwood plywood, decorative plywood, and the "other veneered panels" which were the subject of the Orders all required at least two plies and a core (a minimum of three layers of material), the Scope Ruling impermissibly expanded the ambit of the Orders.

Commerce also determined that the two-ply panels which Finewood imported from China were not substantially transformed when they were used to make plywood in Vietnam and thus the plywood exported to the United States is of Chinese origin.  Because the labor, materials, and processes employed in Vietnam transformed flimsy two-ply panels into a product with novel uses, the country of origin of the plywood is Vietnam, not China.

---

[11] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); and *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 FR 513 (January 4, 2018) (collectively, the "*Orders*").

NON-CONFIDENTIAL VERSION

## VI.   ARGUMENT REGARDING INCLUDING TWO-PLY PANELS IN THE SCOPE ORDER

### A. Commerce Impermissibly Expanded the Unambiguous Scope of the Orders.

InterGlobal agrees with Commerce that, in making a scope determination, Commerce must start with the language of the orders at issue.[12]   InterGlobal further agrees with Commerce that, if the scope is "unambiguous, the plain meaning of the Orders' language governs."[13]   InterGlobal asserts that Commerce should acknowledge that the plain meaning of the language in the Orders is unambiguous when read in the context which jointly applies the same definition to plywood and certain veneered panels.   *Viz.*, panels which have two veneers and a core.   The Order does not on its face cover two-ply panels.   There is nothing in the record which shows that Commerce at any time intended to concern itself with two-ply, wood-on-wood veneers.   The inquiry should stop there.

### B. The Orders Do Not Purport to Apply to All Veneers Which Adhere to Each Other.

Preliminarily, it bears noting that, at every conceivable location in the published Orders, Commerce made it unequivocally clear in its Amended Final Determination of Sales at Less Than Fair Value ("LTFV"), Commerce was not concerned with *all* Hardwood Plywood Products originating from the People's Republic of China.   Rather, Commerce was concerned with only "*Certain* Hardwood Plywood Products from the People's Republic of China."[14]   Commerce consistently defined the products subject to the Orders as "plywood":

(a) Based on affirmative final determinations by Commerce and the International Trade Commission (ITC), Commerce is issuing an antidumping duty order on *certain*

---

[12] *Id.* at p. 6, paragraph 2.
[13] *Ibid.*, quoting W*hirlpool Corporation v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018).
[14] Caption, 83 Fed. Reg. 504.   [Emphasis added.]

NON-CONFIDENTIAL VERSION

hardwood *plywood* products (hardwood *plywood*) *from the People's Republic of China*.[15]

(b) On December 20, 2017, in accordance with section 735(d) of the Act, the ITC notified Commerce of its final affirmative determination that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act, by reason of the LTFV imports of *hardwood plywood from China*.[16]

(c) The ITC also notified Commerce of its determination that critical circumstances do not exist with respect to imports of *hardwood plywood from China* subject to Commerce's final affirmative critical circumstances finding.[17]

(d) Commerce will direct U.S. Customs and Border Protection (CBP) to assess, . . . antidumping duties . . . for all relevant entries of *hardwood plywood from China*.[18]

(e) Antidumping duties will be assessed on unliquidated entries of *hardwood plywood from China*. . . .[19]

(f) Commerce will instruct CBP to continue to suspend liquidation on all relevant entries of *hardwood plywood from China*.[20]

(g) Therefore, . . . we will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of *hardwood plywood from China*. . . .[21]

---

[15] *Id.* Summary. [Emphasis added.]
[16] *Id.* Background. Emphasis added.]
[17] *Id.* [Emphasis added.]
[18] *Id.* at 505. [Emphasis added.]
[19] *Id.* [Emphasis added.]
[20] *Id.* Suspension of Liquidation. [Emphasis added.]
[21] *Id.* Provisional Measures. [Emphasis added.]

NON-CONFIDENTIAL VERSION

(h) This notice constitutes the antidumping duty order with respect to *hardwood <u>plywood</u>*

<u>*from China*</u> pursuant to section 736(a) of the Act. . . .[22]

The foregoing language leaves absolutely no room for any doubt whatsoever that Commerce knew that it intended to regulate imports of three-ply hardwood plywood from China. It is against this entirely unambiguous background that Commerce defined the Scope of Investigation as follows:

The merchandise subject to this investigation is ***hardwood and decorative plywood,***

***and <u>certain veneered panels as described below</u>***.  For purposes of this proceeding,

hardwood and decorative plywood is defined as a generally flat, ***multilayered***

***plywood <u>or other veneered panel</u>***, consisting of two or more layers or plies of wood

veneers ***<u>and a core</u>***, with the face and/or back veneer made of nonconiferous wood

(hardwood) or bamboo.  The veneers, along with the core may be glued or

otherwise bonded together.[23]

**C. Purporting to Find an Ambiguity of Its Own Creation, Instead of Initiating a New Rulemaking Process Subject to the Protections of Notice and Procedural Due Process, Commerce Unilaterally And Improperly Expanded the Scope of Its Definition.**

Contrary to the plain language of the Orders and with complete and utter disregard for the context in which it described its "Scope of the Investigation," Commerce feigns chagrin and asserts that its Orders are ostensibly ambiguous with regard to the meaning of "certain veneered panels."[24] Employing blatant sophistry which strains credulity beyond its elastic limit, Commerce ignores all of its own language and complains that the Orders are ambiguous because they do not provide a

---

[22] *Id.* at 512.  Notification to Interested Parties.
[23] *Id.*  Appendix.  [Emphasis added.]
[24] Scope Ruling at p. 10, paragraph 2.

NON-CONFIDENTIAL VERSION

stand-alone definition of "certain veneered panels" or provide examples of "certain veneered panels."

The truth is that the Orders signal the definition of "certain veneered panels" by adding the phrase, "as described below." Then, the Orders follow up in a sub-clause in which the description of both hardwood and decorative plywood "or other veneered panel" are jointly described as "consisting of two or more layers . . . and a core." This sub-clause was signaled in the first sentence of the Orders with the language "as described below."

## D. The Petitions and Revisions to the Scope Language Prior to Initiation Reflect That Two-Ply Panels Were Not Within the Scope of the Orders And In Fact Were Specifically Removed From the Scope of the Orders.

Clearly wanting to leave absolutely no room for doubt, Commerce adopted the expedient of adding belt-and-suspenders language so as to preclude any attempt to describe Chinese hardwood plywood by some euphemism. The patent purpose behind adding the phrase "other veneered panel" is to define the Covered Merchandise by reference to its characteristics rather than to some novel appellation. In other words, it does not matter whether you call the three-ply product "plywood" or "flooring" or "giant matzah for beavers." If it has "two or more layers . . . and a core . . . with the face and/or back veneer made of non-coniferous wood" it is "plywood." If it is not plywood within the scope of that clear definition it is not within the scope of the Orders.

In the pre-initiation phase of these investigations, the scope provided in the Petitions included a reference to "veneer core platforms." See the Petitions at 5. The scope was subsequently revised prior to initiation to remove the reference to "veneer core platforms" and to add language to the first sentence of the scope indicating that the merchandise covered by the scope is "hardwood

18

NON-CONFIDENTIAL VERSION

and decorative plywood, and certain veneered panels as described below. " (Initiation Notice, 81 FR at 91130).

Removal of the reference to veneer core platforms came about after the parties to this scope inquiry discussed whether the descriptions of the merchandise contained in the petition and the initial investigation might be read to expand the clear scope language of the plywood Orders. *See* Ltr. from deKieffer & Horgan re: Hardwood Plywood from the People's Republic of China - EAPA Scope Inquiry: Request to Rescind Questionnaire Issued to Finewood (April 2, 2020) at 5; Ltr. from deKieffer & Horgan re: Hardwood Plywood from the People's Republic of China: EAPA Scope Inquiry: Rebuttal Comments to Comments on Finewood's Questionnaire Responses (May 13, 2020), CR-10 at 2-4; Ltr from Wiley on behalf of the Coalition for Fair Trade in Hardwood Plywood "Coalition" or "Petitioner"), Hardwood Plywood Products from the People's Republic of China: Response to Finewood's Request to Rescind Questionnaire (April 7, 2020) (CR-2) at 3-4 (the Coalition explicitly stated in the petition that two ply cores were covered by the scope).

The question of whether "veneer core platforms" potentially composed of only two plies of wood could be included in the scope of the hardwood plywood investigations was subsequently specifically reconsidered and was definitively rejected before the initiation of the investigations. Commerce cannot now claim that such products are covered by the scope of the investigations. As such, Commerce's claim that the Hardwood Plywood Orders cover Chinese-origin veneers and panels of less than three-ply not directly contradicts the plain scope language in the initiation documents (19 CFR § 351.225(k)(1)). Accordingly, the k(1) analysis in this case results in a determination that 2-ply panels are not within the scope of the subject merchandise. See Petitioner's Ltr., Certain Hardwood Plywood Products from the People's Republic of China, section "I. Scope Language for Investigation" at 1-2 & Ex. 1 (Dec. 6, 2016), excerpts attached at

NON-CONFIDENTIAL VERSION

Exhibit SQ1-26 (CR-67); and Dep't Commerce, Memorandum to File re: Meeting with Counsel

to Petitioner and Customer {sic.} and Border Protection (Dec. 7, 2016), concerning a conference

call on December 2, 2016 between the Department, CBP, and Petitioner discussing issues related

to the proposed scope of the investigations, attached at Exhibit SQ1-27 (CR-68).

**E.  Utilization Of Two-Ply Panels Was An Inevitable Consequence Of The Definition Commerce Elected To Employ, And It Should Not Be Permitted To Entrap Manufacturers And Importers Who Adhered To The Definitions And Rules By Unilaterally Changing The Interpretation Of The Scope Of The Orders.**

The United States Court of International Trade recognizes that production and exports

naturally flow to companies with lower tax rate burdens.  *See, Inmax SDN v. United States*, 277 F.

Supp. 3d 1367 (Ct. Int'l Trade 2017).  By extension, production and exports also naturally flow to

countries with lower tax rate burdens and lower tariffs in general.  In *Inmax SDN*, two affiliated

Malaysian steel nails producers received very different AD rates because Commerce refused to

collapse them in the first instance.  *Id.*, at 1369.  The holding company which owned the affiliate

issued a public statement explaining that Inmax would continue export activities only from the

company with the lower AD rate.  Thereupon, U.S. industry requested that Commerce conduct a

Changed Circumstances Review ("CCR"), allegedly to prevent the Inmax companies from evading

AD duties.  Commerce acquiesced.  *Id.* at 1370.  The CIT overturned Commerce's CCR

determination and gave short shrift to Commerce's tautological rationale that production and

export by companies with low AD rates inherently constitutes evasion of AD duties.

Commerce found that the Inmax companies did not illegally co-mingle subject

merchandise in their exports, and that their parent publicly, and transparently, communicated a

change in their export behavior due to the differing assigned rates.  Commerce reluctantly

NON-CONFIDENTIAL VERSION

acknowledged that "this avoidance could be seen by some as a reasonable corporate resources decision." The court concluded that not just "some" but all would view such a production change as a reasonable corporate resource decision. *Id.*, at 1372-73 (emphasis in original). The court gave no credence to Commerce's unreasonable and unsubstantiated conclusions of manipulation and evasion.

The perverse logic employed by Commerce in this instance is reminiscent of the circumstances in the *Inmax* case. Finewood identified and exploited an inherent gap in the scope of the Orders precisely because the scope of Commerce's Order was necessarily limited to the conditions, customs, and practices which obtained at the time when Commerce conducted its investigation. There is no record of any complaints about two-ply, wood-on-wood hardwood veneers unfairly penetrating the U.S. market. At the prompting of the Petitioners, Commerce now essays a patently *post hoc* attempt to block manufacturers from behaving in a commercially reasonable manner by changing their business practices so as to operate within the letter of the law as established by the Orders.

The illogic employed by Commerce was disregarded in the case of *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) where the Federal Circuit Court reversed the decision of the CIT. There, the CIT began its analysis by first determining whether the merchandise was covered in the petition. The Federal Circuit stated that the CIT approached the matter "exactly backwards." The Federal Circuit framed the question as "whether the . . . final scope orders included the subject merchandise."

Similarly, while Commerce may look to the Coalition for Fair Trade in Hardwood Plywood's ("Coalition") Petition and the initial investigation "for guidance," the Petition and

NON-CONFIDENTIAL VERSION

initial investigation may not "substitute for language" in the Orders themselves.[25]  Commerce is approaching the issue "exactly backwards."  Commerce must first determine whether the Orders include the two-ply panels – which they do not.  "[A] predicate for the interpretive process is language in the order that is subject to interpretation."[26]  It is "the language of the final scope order [that defines] the merchandise subject to the order."[27]  In this instance, there is no language that is subject to interpretation.  The language of the Orders clearly defines the merchandise as requiring at least three plies.  The language of the Orders is dispositive.

It may be that the Coalition and Commerce have now been required to recognize that they lacked imagination and that their choice to adopt the three-ply definition may have been short-sighted, but Commerce does not possess the authority to go back in time and unilaterally add matters and remove information from the record of the original proceedings.

### F.  Even If the Scope Language Was Ambiguous, Commerce Incorrectly Interprets the Scope to Include Two-Ply Panels.

In *Duferco*, a foreign manufacturer appealed from a CIT decision holding that the manufacturer's imported floor plate with "patterns in relief (*i.e.*, raised figures at regular intervals that provide a skid-resistant surface) derived directly from rolling" was within the scope of the AD and CVD Orders relating to cut-to-length carbon steel floor plate.  There was no claim that the language of the orders covered the product.  Accordingly, the Federal Circuit reversed the decision of the CIT.  The Federal Circuit emphasized the general rule that "Commerce cannot 'interpret' an antidumping order so as to change the scope of that order, nor can Commerce interpret an order

---

[25] *Id*. at 1097.
[26] *Id.*
[27] *Id*.

NON-CONFIDENTIAL VERSION

in a manner contrary to its terms."[28]  Here, Commerce is doing that which is specifically prohibited. There is no claim that language of the Orders covers two-ply wood-on-wood product.  Commerce is changing the scope of the Orders or, at a minimum, interpreting the Orders in a manner contrary to the plain language.

In *Duferco*, the orders referenced "flat-rolled products of nonrectangular cross-section where such cross-section is achieved subsequent to the rolling process (*i.e.*, products which have been 'worked after rolling'). . . . ."[29]  The Federal Circuit held that the language "cannot reasonably be interpreted to include floor plate with patterns in relief achieved *during the rolling process*."[30] Likewise, here, the language of the Orders "cannot be reasonably interpreted to include" two-ply panels where at least three plies is described as the *sine qua non* of plywood or "other veneered panel."

In *Allegheny Bradford Corp, d/b/a Top Line Process Equipment Company v. United States*, 28 C.I.T. 830 (Ct. Int'l Trade June 4, 2004) the court framed the issue in that case.  "The issue in this case is whether Commerce may construe an antidumping order to cover products which bear a characteristic that cannot be reconciled with the language of the order."[31]  The court held that Commerce could not do so.  There, the importer's entries were of *square-edged* stainless steel butt-weld tube fittings from Taiwan, but the scope of the antidumping order covered *bevel-edged* stainless steel butt-weld pipe fittings from Taiwan.  The court held that beveled edges was the "absolute requirement" for the product to fall within the scope of the order.   Likewise in this proceeding, three-ply is the "absolute requirement" for the product to fall within the scope of the

---

[28] *Id.* at 1095 *quoting Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001).
[29] *Id.*
[30] *Id.*  (Emphasis added.)
[31] *Id*. at 1183.

NON-CONFIDENTIAL VERSION

Orders.  Commerce may not interpret the Orders to cover two-ply panels when that characteristic cannot be reconciled with the language of the Orders.

The *Allegheny* court emphasized the general rule that the "language of an order is the 'cornerstone' of a court's analysis of an order's scope."[32]   Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it."[33]   Here, the Orders do not contain language specifically including two-ply panel nor may the Orders be reasonably interpreted to include two-ply panel.

## VII.   ARGUMENT REGARDING SUBSTANTIAL TRANSFORMATION OF THE TWO-PLY PANELS

### A.  Because the Two-Ply Panels Were Substantially Transformed In Vietnam, China is Not the Country of Origin for the Resulting Plywood.

The substantial transformation analysis asks "whether, as a result of manufacturing or processing, the product 'loses its identity and is transformed into a new product having a new name, character and use.'"  *Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018) *citing Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999).  Five factors are considered:

1.  Whether the processed downstream product falls into a different class or kind of product when compared with the upstream product;

2.  Whether processing in the third country changes the important qualities or use of the component;

---

[32] *Id*. at 1184 *citing Duferco*, 296 F.3d at 1097-98
[33] *Id.*

NON-CONFIDENTIAL VERSION

    3.  The nature and sophistication of processing;

    4.  The cost of product/value added to the product; and

    5.  The level of investment.[34]

In this matter, the downstream product is hardwood plywood produced in Vietnam and the upstream product is two-ply wood-on-wood panels produced in China which are not large enough to form a single sheet of plywood unless they are butted together before being glued, pressed, and cut with new outside veneers. *Cf.* Finewood Supp. IV Rsp. at Ex. SV1-28 (comparing pictures 9 and 10 with 7, 8, 12, and 13).

Commerce analyzes the above factors on a case-by-case basis and then determines whether the totality of the circumstances supports a finding of substantial transformation or no transformation. No factor is dispositive in and of itself. *See Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1236, 1343 (Ct. Int'l Trade 2019) ("*Bell Supply VI*"). In the event of an appeal of Commerce's scope determination, the court will consider whether Commerce's findings regarding the factors listed above are reasonable in light of the record evidence. Id. at 1237.

## B. Applying The Five Factor Test Demonstrates That the Two-Ply Panels Were Substantially Transformed In Vietnam

In the Scope Ruling, Commerce incorrectly applies the above five factors and erroneously concludes that substantial transformation did not occur in Vietnam with respect to the two-ply panels from China. The analysis of each of the five factors set forth below demonstrates that that the two-ply panels were substantially transformed in Vietnam.

---

[34] *See Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1228-29 (Fed. Cir. 2018).

NON-CONFIDENTIAL VERSION

**Factor 1: Two-Ply Panels and Plywood or Veneered Panels Fall Within Two Different "Classes or Kinds" of Merchandise.**

In the *Bell Supply* litigation, Commerce stated that its "same class or kind" analysis was tied to the scope of the relevant orders and to the question of whether the clear language of the scope covers both the upstream and downstream products. *Bell Supply VI*, 393 F. Supp. 3d 1229 at 1237-1238. Indeed, in its Third Remand Determination in Bell Supply, Commerce explained that "{t}he term 'class or kind of merchandise' is used interchangeably throughout the statute with the term 'subject merchandise.'" Dep't Commerce, Final Results of Redetermination Pursuant to Remand (March 29, 2019) at 9-10, citing to the legislative history of the AD & CVD statutes.

"Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it. . .. Significantly, Congress made no provision for bringing other merchandise within the scope of antidumping and countervailing duty orders that was otherwise outside the language of those orders. We are compelled to conclude that in other respects Congress intended the language of the orders to govern." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089, 1098 (Fed. Cir.2002); see also *Bell Supply IV* at 1228 ("AD and CVD orders only encompass merchandise identified in the language of the Order," citing to *Duferco* Steel, 296 F.3d at 1097); *Fabuwood Cabinetry Corp. v. United States*, 469 F. Supp. 3d 1373, 1378 (Ct. Int'l Trade 2020) ("'{T}he plain language of an antidumping order is 'paramount' in determining whether particular products are included within its scope,'" citing to *Meridian Prods., LLC v. United States*, 890 F.3d 1272 (Fed. Cir. 2018)).

The two-ply panels (the upstream product) are a different class or kind of merchandise than plywood or veneered panels (the downstream product) described in the Orders.  The plywood and

26

NON-CONFIDENTIAL VERSION

veneered panels in the Orders must have three plies.  Instead, the two-ply panels are more like two-ply "reinforced core veneers" used as part of the fabrication of plywood.  The two-ply product cannot be used as plywood core because it is not stable enough to function as a plywood substrate or platform.  Additional plies or veneers must be added to form plywood core.

Veneers are significantly different products from plywood, so, when made into plywood, substantial transformation takes place, and where the plywood is made is the country of origin. Likewise, here, the Chinese two-ply panels are a significantly different class or kind of merchandise than plywood.  Ergo, when they are made into plywood in Vietnam, substantial transformation takes place and Vietnam is the country of origin.

The fact that the explanatory notes ("ENs") to the Harmonized Tariff Schedule of the United States ("HTS") define "veneered panels" as "panels consisting of a thin veneer of wood affixed to a base" is not relevant here.[35]  The two-ply panels do not contain a "base" element. Similarly, the analogy to engineered wood flooring is not dispositive.  The two-ply panels are not rigid like engineered wood flooring.  The two ply-panels are not veneer face added to a substrate. There is no "substrate" to two-ply panels.

Most importantly, the Orders in this proceeding specifically state that hardwood and decorative plywood, or "other veneered panel[s]," consist of "two or more layers or plies of wood veneers and a core. . . ."  The written description of the Orders is dispositive.  Because the two-ply panels are not of the same "class or kind" of merchandise as plywood, this factor does not support the conclusion of substantial transformation.

---

[35] Scope Ruling at p. 15, FN 73.

NON-CONFIDENTIAL VERSION

Commerce's initiation notice of this scope inquiry also restates Commerce's final determination and provides the most basic definition of in-scope plywood as consisting of three layers – two layers or plies of wood veneer and a core. See DOC Initiation of Scope Inquiry: "{f}or purposes of this proceeding, hardwood and decorative plywood is defined as a generally flat, multilayered plywood or other veneered panel, consisting of two or more layers or plies of wood veneers and a core." Finewood's two-ply panels purchased from China are not composed of a core and a minimum of two layers of veneer.  One sheet of Finewood's two-ply consists of one layer of single core veneer glued onto another layer of single core veneer.

In construction as well as optically and functionally, Finewood's two-ply is a reinforced veneer, which is sometimes referred to as "board-on-board" veneer. Finewood's two-ply simply does not meet Commerce's definition of "plywood" as defined in the Orders.

**Federal Courts, the CBP and the World Customs Organization Council All Unequivocally Define "Plywood" as Having at Least Three Plies.**

In considering whether Commerce's use of the terms "plywood" and "consisting of two or more layers of plies of wood veneers and a core," in the scope language is ambiguous, no lesser authority than the U.S. Court of Appeals for the Federal Circuit ("CAFC") has opined on the definition of plywood and these terms. In *Boen Hardware Flooring*, the CAFC stated unequivocally: There are three common characteristics of "plywood" found in the definitions provided above: (1) there must be at least three layers; (2) each layer must be arranged at a right angle to its adjacent layer; and (3) the layers must be bonded together.  *Boen Hardwood Flooring, Inc. v. United States*, 357 F.3d 1262, 1265 (Fed. Cir. 2004) {emphasis added}.

The CAFC reaffirmed the *Boen* Court's findings on the definition of plywood in *Kahrs International*:

NON-CONFIDENTIAL VERSION

We have previously considered the meaning of "plywood" in the context of the HTSUS. In Russell Stadelman & Co. v. United States, 242 F.3d 1044 (Fed. Cir. 2001), we said, "Plywood consists of a panel composed of layers of wood glued together, usually with the grains of adjoining layers at right angles to each other." 242 F.3d at 1046 n.2 (citing The American Heritage Dictionary 1352 (4th ed. 2000)). We confirmed this basic definition in Timber Products Co. v. United States, 515 F.3d 1213 (Fed. Cir. 2008), where we explained, "Plywood consists of three or more wooden sheets pressed together, with each sheet referred to as a 'ply.'" 515 F.3d at 1217. . . .Perhaps our most thorough review of the term "plywood," however, is our opinion in Boen Hardwood Flooring, Inc. v. United States, 357 F.3d 1262 (Fed. Cir. 2004). In Boen, we considered the proper definition of plywood in classifying laminated wood flooring that was substantially the same as Kahrs' EWF imports. 357 F.3d at 1263-64. Reviewing various trade and dictionary definitions of the term "plywood," we concluded that "[t]here are three common characteristics of 'plywood' found in the definitions provided above: (1) there must be at least three layers; (2) each layer must be arranged at a right angle to its adjacent layer; and (3) the layers must be bonded together." Id. at 1265.

*Kahrs Int'l v. United States*, 713 F.3d 640, 645 (Fed. Cir. 2013).

Finally, both CBP and the World Customs Organization Council, which administers the Harmonized Tariff Schedule, define "plywood" as requiring at least three plies. As discussed above, the ENs, which CBP relies upon in classifying products, defines "Plywood" as "consisting of three or more sheets of wood glued and pressed one on the other and generally disposed so that the grains of successive layers are at an angle." *See,* ENs for HTS 4412, Exhibit SQ1-50 to

29

NON-CONFIDENTIAL VERSION

Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation (see CR-123) and, e.g., CBP Ruling N265846 (July 26, 2015) (discussing the ENs three-layer requirement in classifying plywood); CBP Ruling N295153 (April 6, 2018) (discussing the ENs three-layer requirement in classifying an 11-ply plywood). In this case, the scope language is unambiguous, and Commerce need not progress to analysis of the 19 CFR 351.225(k)(1) and 19 CFR 351.225(k)(2) factors. Finewood's two-ply products purchased from China are not composed of a core and a minimum of two layers of veneer and are therefore not covered by the Orders on hardwood plywood from China.

### Factor 2 - The Properties, Essential Components, and End Use of the Two-Ply Panels Support the Conclusion that Substantial Transformation Occurred in Vietnam.

A two-ply panel is only comprised of two plies without the substantial strength to be considered plywood. A two-ply panel is not rigid. By comparison, plywood must have at least three plies, consisting of a strong core and face veneer. These properties make two-ply panels very different from plywood, even if they are both comprised of veneer and glue.

The use of the two-ply panel is not the same as the use of plywood. Indeed, Commerce acknowledges the veneer and glue of two-ply panels must be "processed into a panel that is suitable for future use <u>in the production of plywood</u>."[36] (Emphasis added). Moreover, the ITC reports that "{h}ardwood plywood was sold on the basis of grade, type of core, overall panel thickness, and face species. It could be characterized by species, veneer quality, thickness, number of plies, type of core, and the type of adhesive used in the manufacturing process." ITC Final Rpt. at 10. Hardwood plywood products "are used in interior and non-structural applications. Hardwood

---

[36] Scope Ruling at pg. 25, paragraph 1.

NON-CONFIDENTIAL VERSION

plywood is commonly chosen for decorative and aesthetic reasons, for use in products such as furniture, kitchen cabinets, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles ("RVs")."  ITC Final Rpt. at I-13.

Thus, two-ply panels are used in the manufacture of plywood and cannot be substituted for finished plywood. [37]  Significantly, the ITC's Final Report informs that the ITC investigated injury to the U.S. industry producing hardwood plywood.  The ITC did not investigate injury to the U.S. industry producing two-ply panels.  *See,* ITC Final Rpt. at I-8 – I-14.  Two-ply panels, on the other hand, can never fulfill the expectations of plywood purchasers or be used for furniture, kitchen cabinets, architectural woodwork, wall paneling, manufactured homes, and RVs as a substitute for hardwood plywood.  The two-ply panels that Finewood purchased have one use, and one use only, to form part of the core platform that will be finished into a variety of hardwood plywood products when face and back veneer is added.  *See*, sample packages of Finewood purchases of two-ply panels from Finewood Questionnaire Rsp. (March 22, 2019) at Ex. 8.1, 8.2, 8.16 & 8.78, attached as Exhibit SQ1-33 to Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation dated April 20, 2021 (see PR-91 and PR-92, CR-117 through CR-123).

The construction of two-ply panels does not determine the final number of plies in the finished core platform nor the final thickness of the finished plywood nor the species of the face veneer.  Two-ply is glued only once and has no stability for the construction of cabinets, furniture, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles.  Two-ply panels are not graded nor are they CARB certified.  Hardwood plywood, on the other hand, is sold

---

[37] Finewood adds that two-ply panels might be used as fencing, boxes, bins, crates, or other packaging that do not require a stable plywood construction.  Scope Ruling at pg. 29, FN 168.

NON-CONFIDENTIAL VERSION

on the basis of grade, type of core, overall panel thickness, and face species.  Hardwood plywood is characterized by species, veneer quality, thickness, number of plies, type of core, and the type of adhesive used in the manufacturing process.  ITC Final Rpt. at 10 and Exhibits SQ1-29 through Exhibit SQ1-35 to Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation dated April 20, 2021 (see PR-91 and PR-92, CR-117 through CR-123).

The construction process performed in Vietnam gave Finewood's finished hardwood plywood its dimensional stability and made it resistant to expansion and contraction caused by humidity.  *See,* ITC Final Rpt. at I-13.

The ITC reports that finished hardwood plywood is sold to plywood distributors and retailers. ITC Final Rpt. at II-2.  As indicated above, plywood distributors and retailers, in turn, supply plywood to producers and end-users of cabinets, furniture, architectural woodwork, wall paneling, manufactured homes, and recreational vehicles.  *See, e.g.,* ITC Final Rpt. at I-13 & II-10 through II-15 and Columbia Forest webpage at https://www.columbiaforestproducts.com/#, Exhibit SQ1-30 to Finewood Supplemental Questionnaire Response – Part IV and Information on Substantial Transformation dated April 20, 2021 (see PR-91 and PR-92, CR-117 through CR-123).

.  The two-ply panels at issue here are sold exclusively to plywood producers to be integrated into the core of the plywood.  The two-ply panels are only a semi-finished raw material component of the core itself; the panels are not sufficiently stable to function as a plywood core or substrate.  Therefore, no overlap exists in the channels of distribution and advertising of two-ply panels and finished hardwood plywood.

Accordingly, the differences in properties and end use support the conclusion that substantial transformation takes place in Vietnam when the two-ply panels are manufactured into plywood.

32

NON-CONFIDENTIAL VERSION

**Factor 3 - The Nature and Sophistication of Plywood Processing Supports the Conclusion that Substantial Transformation Occurred in Vietnam.**

The case of *Peer Bearing Co.-Changshan v. United States*, 128 F. Supp. 1286, 1299 (Ct. Int'l Trade 2015) is instructive on the issue of processing.  In that case, the court asked whether the upstream product had the same characteristics as the downstream product.  The court found that, because the upstream product required additional processing, Commerce could not find that the final country's processing was merely "unassembled" or "unfinished" downstream product.  Likewise, two-ply panel requires much more significant processing to turn it into plywood.  It is not merely "unassembled" or "unfinished" plywood.  The substantial and sophisticated processing in Vietnam demonstrates that substantial transformation takes place.

Finewood's production of plywood in Vietnam is a very substantial and sophisticated process.  It requires the positioning of an individual veneer on top of another, properly gluing and pressing the wood sheets together, cutting, patching, trimming, sanding, and adding ultraviolet coating.  While Finewood purchased veneers from China, all of its core platforms were manufactured in Vietnam, some by Finewood and some by Vietnamese tollers.  However, Finewood provided all of the wood and glue to the tollers and mixed its own glue.  Finewood also finished the production by gluing face veneer onto the core platforms at its facilities and all the hardwood plywood sold to the U.S.

The sophistication in the production of hardwood plywood with a veneer core comes from the positioning of individual veneer one on top of the other, properly gluing and pressing these wood sheets together, cutting, patching, trimming, and sanding, and in Finewood's case, adding a UV coating to the finished plywood.  Finewood undertook all of these production steps in Vietnam.  All of Finewood's hardwood plywood sold to the U.S. was made with veneer core.

33

NON-CONFIDENTIAL VERSION

The veneers are stacked with their grain in alternating directions to provide strength and stability to the finished product; a cold press is used to fabricate the several plies of veneer together prior to being hot pressed to glue the veneers together; the core is trimmed and sanded to make a suitable platform for the face and back veneer.  *See also*, Finewood's SQ1 Rsp.-II at 3-4 and Exhibits SQ1-21.1 (see CR-105), 21.2 (see CR-106), 21.3 (see CR-107), 21.4 (see CR-108, and 21.5 (see CR-109) .

Generally, the processing of hardwood plywood made with a veneer core can be divided into three steps: (i) the slicing of veneer from debarked logs and drying for use in the production of hardwood plywood; (ii) production of the veneer core; and (iii) application of face and back veneer and finishing operations.  The ITC states that veneers are often, but not always, produced at a separate facility or by a different company than the manufacturer of hardwood plywood.  ITC Final Rpt. at I-15 – I-16.

Finewood, for instance, did not produce its own veneers, but rather purchased veneer sheets from third-party suppliers in Vietnam and China.  The portion of veneer purchased in Vietnam was [  ]% and in China [   ]%, which includes both single veneer sheets and two-ply panels.  *See*, Finewood Qre Rsp Part I, (see PR-26, CR-3) (April 9, 2020) at Exhibit 10 and Finewood Qre Rsp Part II, (see PR-28, CR-4 to CR-7) (April 23, 2020) at Exhibit 4.

All of the above processes took place in Vietnam.  Finewood produced approximately [  ] of its plywood core with a center of two-ply panels made in China and additional layers of veneer plies added in Vietnam to complete the core platform.  Finewood's veneer panels ranged in thickness from [          ].  The plywood cores built from two-ply panels were used for finished hardwood plywood ranging from [             ].  See Finewood Supplemental Questionnaire

NON-CONFIDENTIAL VERSION

Response – Part IV and Information on Substantial Transformation dated April 20, 2021 (see PR-91 and PR-92, CR-117 through CR-123).

As set forth above, the administrative record shows that two-ply panels have none of the essential characteristics of hardwood plywood, and the nature and sophistication of Finewood's production in Vietnam evidenced in the administrative record demonstrates that the two-ply panels underwent a substantial transformation to become hardwood plywood that could be sold and used as such. Finewood's processing of raw materials into hardwood plywood in Vietnam is sufficiently substantial and sophisticated to support a conclusion of substantial transformation.

**Factor 4 - The Cost and Value Added are Sufficiently Substantial to Support the Conclusion that Substantial Transformation Takes Place in Vietnam.**

Finewood estimates that its cost of production and value-added constituted [      ] percent of the total cost of the plywood exported to the United States. Factor 4 is not dispositive of the issue of substantial transformation, however. The general rule is that no one factor in the substantial transformation analysis is determinative. Indeed, without reference to any cost analysis, the CBP's September 12, 2019, *Memo to the File Re: Adding Certain Documents to the Administrative Record* determined that substantial transformation takes place when veneers are manufactured into plywood. Thus, Commerce's finding relating to the relative value added by Finewood in Vietnam is not dispositive. That having been said, Finewood's cost and value added is sufficiently substantial to support the conclusion that substantial transformation of the two-ply panels takes place in Vietnam.

For its cost of production and value-added analysis, Commerce asked Finewood to provide a database of its factors of production ("FOPs"). *See*, Dep't Commerce, Finewood Supplemental Questionnaire at Question 6 & Appendix I - Factors of Production Questionnaire (March 2, 2021).

NON-CONFIDENTIAL VERSION

Because Finewood has documentation of consumption for only its wood inputs and UV coating, Finewood used an FOP database from Chengen's producer of subject merchandise Dongfangjuxin that was submitted in the first administrative review of the AD Order of Hardwood Plywood from China, 2017-18 "AD POR 1") for reporting unit quantities of the remaining inputs during the contemporaneous period as Exhibit SQ1-38 (see CR-79).  For the documents from AD POR 1 filed in this case, see Ltr. from deKieffer & Horgan re: Hardwood Plywood from the People's Republic of China: Scope Inquiry – Placing Information from POR 1 on the Record (April 13, 2021) See PR-62 through PR-84, CR-25 through CR-96.

For valuing inputs sourced in China, Finewood used surrogate values from a surrogate country on an economic level with China - Malaysia; for valuing inputs sourced in Vietnam, Finewood used surrogate values from a country on an economic level with Vietnam - India.

In sum, for reporting Finewood's factors of production, Finewood's consumption quantities of [                                                                    ] are derived from Finewood's production records that were submitted to CBP.  Finewood submitted the production records for each sale to CBP.  For [                                              ], Finewood had purchases from both China and Vietnam suppliers and therefore split the consumption by the percentage of the purchases from China and Vietnam.  For 2-ply sourced from China, other auxiliary materials, energy and labor, Finewood submitted FOPs from Chengen's database submitted in the Hardwood Plywood AD POR 1 as other facts available and used the averaged per M3 consumption of the auxiliary materials.

Part of Finewood's production of cores was sourced from [      ] Vietnamese tollers. Finewood provided the tollers with all of the inputs, but it never obtained (let alone kept) records of the tollers' labor hours.  Unit labor hour consumption is therefore used from Chengen's records

NON-CONFIDENTIAL VERSION

as reasonable and representative facts available.  *See*, Finewood's Supplemental Questionnaire Response and Exhibits (March 30, 2021) (see PR-59, CR-14 through CR-24) and April 13, 2021, see PR-85 through PR-90, CR-97 through CR-116 for further details.

In response to the Supplemental Questionnaire, the unit value of Finewood's inputs for each hardwood plywood CONNUM[38] that Finewood sold to the U.S. is provided in Finewood's Exhibit SQ1-19 (see CR-103).  In response to Question 6.c., specifically, Finewood reported the consolidated unit FOP in Exhibit SQ1-21.5 (see CR-109).  In Exhibit SQ1-40 (see CR-81) Finewood calculated the unit cost for 2-ply, taking into account average surrogate financial ratios used by Commerce in C Hardwood Plywood AD POR 1.

In Exhibit SQ1-23 (see CR-111) Finewood submitted a unit consolidated FOP database with 2-ply FOPs integrated, and Finewood has noted for each input whether it was sourced in China or Vietnam. In Exhibit SQ1-41 (see CR-82) Finewood calculated the percentage of the value added in Vietnam to its cost of production for each CONNUM.  *See*, calculation at the end of the top rows of CONNUMs.  The overall average of the value added in Vietnam is [      ].

For Finewood's value-added comparison, the Vietnam cost percentages are different among different CONNUMs because some used more Vietnamese [              ] veneers and some used more Chinese [          ]. Nevertheless, the overall cost in Vietnam exceeded [    ]. As further explanation for the added-value calculation for Vietnam:

---

[38] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise under investigation. *See AG der Dillinger Hüttenwerke, et. al. v. United States*, Consol. Court No. 17-00158, Slip Op. 21-102, dated August 18, 2021, FN3.

NON-CONFIDENTIAL VERSION

(i)  Profit, as submitted in Exhibit SV-15, has been added in this comparison (see CR 116).

(ii) Indian Rupees (RS) are converted to USD for labor and water. The average exchange rate for 2018 is [          ] RS to 1 USD.

(iii) Wood is converted from M3 to KG or from KG to M3 because some Indian SVs are in KG, and the wood weight in KG is needed to calculate inland freight.

(a) The difference species of wood veneers and core platform are converted by wood densities submitted in Exhibit SQ1-24. (See CR-112)

(b) For 2-ply, [   ]/M3 is used as it is more like poplar core veneers.

(iv) For natural gas, the SV is on a per KG basis, but the FOP is on a per M3 basis. The conversion ratio of [       ] is used as set in Chengen's final SV spreadsheet in Hardwood Plywood AD POR 1.

Commerce has no established threshold for determining the point at which a certain value-added figure constitutes substantial transformation.  In various proceedings, Commerce has considered 34% of the total cost of manufacture to not indicate a substantial transformation, but 38% of the total cost of manufacture to support a finding of substantial transformation.  *See*, *Bell Supply VI*, 393 F. Supp. 3d 1229 at 1243.  As seen from the above discussion and in Exhibit SQ1-41, (see CR-82), the value added in Vietnam to Finewood's finished hardwood plywood at [   ] is well above the 38% that Commerce has found to support a finding of substantial transformation of the upstream input through production processes in the downstream country.  This factor weighs forcefully in favor of a substantial transformation in Vietnam of Finewood's finished hardwood plywood.

NON-CONFIDENTIAL VERSION

**Factor 5 - The Level of Finewood's Investment is Sufficient to Support the Conclusion that Substantial Transformation Takes Place in Vietnam.**

"The goal of the substantial transformation test is to determine whether the processing is 'of such significance as to require' that the merchandise be deemed to be from that country." *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1229 (Ct. Int'l Trade 2018). Here, the record shows that Finewood's investment was sufficient to deem that the merchandise be considered to be from Vietnam.

In order to determine whether the level of investment is sufficient to support a conclusion of substantial transformation, Commerce reviews the shareholders' initial capital, investment in equipment and the production facilities, the cost of processes performed, and the number of employees and labor hours in each country, in the instant matter being China and Vietnam. See, *e.g.*, *U.K. Carbon & Graphite Co. v. United States*, 931 F. Supp. 2d 1322, 1335 (Ct. Int'l Trade 2013) ("In its underlying determination, Commerce compared in each country the level of investment, 'both in initial capital and equipment,' the production facilities, the processes performed, and the number of production employees in each country. . .").  In this case, Finewood's level of investment exceeded the Chinese company's investments in terms of initial capital, purchases of equipment and machinery, and cost of production.  In all other respects, Finewood's investment is comparable to the Chinese company's investments.  In the instant matter, a comparison between Finewood and Chengen's producer of subject merchandise, Dongfangjuxin, is appropriate. Chengen was a mandatory respondent in both Commerce's initial investigation of hardwood plywood from China and in Commerce's first administrative review of the Order, 2017-18, which overlaps with Finewood's production operations.

NON-CONFIDENTIAL VERSION

Commerce chose Chengen as a mandatory respondent because the company had significant exports of subject merchandise to the United States and was considered to be representative of the Chinese plywood industry in calculating dumping margins for non-mandatory respondents. For instance, in *Changzhou Hawd Flooring Co. v. United States*, 848 F.3d 1006, 1012 (Fed. Cir. 2017), in referring to Commerce's mandatory selection process, the Court stated that the prevailing case law relies on "the statutory standards for selecting mandatory respondents under § 1677f-1(c)(2), which, the court held, make the mandatory respondents representative unless evidence shows otherwise," citing to *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345, 1353 (Fed. Cir. 2016).

A summary spreadsheet showing each item below and each company's investment and cost was attached as Exhibit SQ1-42 to Finewood's response dated April 20, 2021 to Question 13 of Commerce's Supplemental Questionnaire (see PR-91 to PR-92, CR-117 through CR-123).

**a. Initial Capital.**  To compare the initial capital required to operate each company we have considered (i) registered capital, (ii) paid-in capital, and (iii) paid-in capital plus short-term loans.

**(i) Registered Capital.**  Dongfangjuxin's registered capital was [      ] RMB, or about [ ] million USD.  *See*, Dongfangjuxin's business license, Exhibit SQ1-43 (see CR-84) (originally submitted as Exhibit SQ1-5 in Chengen 17-18 review).  Finewood's registered capital amounted to [      ] USD. Exhibit SQ1-4 submitted with Finewood's SQR-Part I in this scope inquiry).

**(ii) Paid-in Capital.**  Dongfangjuxin's paid-in capital was [      ] RMB, or about [      ] USD. See Dongfangjuxin's 2018 Audited Financial Statements, see Exhibit SQ1-44 (see CR-85) (originally submitted in Exhibit SQ1-7 in Chengen 17-18 review: 2018 end balance in audited financial statements).  Finewood's paid-in capital was [                ]

40

NON-CONFIDENTIAL VERSION

VND, or about [          ] USD (owner's investment + other owner's capital).  *See*, Finewood's 2018 monthly financial reports Exhibit SQ1-45 Barcode:4112453-02  (originally submitted as Exhibit 16.1 in EAPA investigation).

**(iii) Paid-in Capital + Short Term Loans.**  Dongfangjuxin: [          ] RMB, or about [          ] USD. See Exhibit SQ1-44 (see CR-85) (originally submitted as Exhibit SQ1-7 in 17-18 review: 2018 end balance in audited financial statements).  Finewood: [          ] VND, or about [          ] USD (owner's investment + other owner's capital), Exhibit SQ1-45 Barcode:4112453-02  (originally submitted as Exhibit 16.1 in EAPA investigation).  This comparison between the two companies shows that Finewood's initial investment is unequivocally comparable to Dongfangjuxin's investment in the production of hardwood plywood.

**b. Investment in Equipment and Machinery**.  Dongfangjuxin invested [          ] RMB, or [          ] USD in fixed assets and construction in progress.  *See*, Exhibit SQ1-44 (see CR-85) (originally submitted as Exhibit SQ1-7 in 17-18 review: 2018 end balance in audited financial statements) Finewood invested [          ] VND, or [          ] USD in fixed assets + construction in progress.  *See*, Exhibit SQ1-45 Barcode:4112453-02  (originally submitted as Exhibit 16.1 in EAPA investigation).  The total value of Finewood's equipment purchases as provided in Exhibit 7 (see CR-48) of Data from DeKieffer & Horgan of Commerce Pertaining to Finewood in this scope inquiry is less than [          ] because Exhibit 7 only included the purchases of important equipment.  This comparison shows that Finewood's investments in equipment and machinery is larger than Dongfangjuxin's investments.

**c. Cost of Production.**  Dongfangjuxin's cost of production was [          ] RMB, or [          ] USD.  This figure is calculated using Dongfangjuxin's cost of goods sold (COGS) from April 2018 through December 2018 since Finewood started sales as of May 2018, and thus

41

NON-CONFIDENTIAL VERSION

Finewood's 2018 cost of production included COGS from May through December 2018.  *See*, Dongfangjuxin's monthly income statements in Exhibit SQ1- 46 (see CR-86)   (originally submitted as Exhibit SQ3-41 in Chengen's 17-18 review). Finewood's cost of production was [ ]  VND, or [          ] USD (COGS as of December 2018). Exhibit SQ1-45 Barcode:4112453-02 (originally submitted as Exhibit 16.1 in EAPA investigation)

 **d. Number of Employees and Labor Hours.**  Since Finewood outsourced a substantial amount of core platform production to tollers while Dongfangjuxin performed all production steps for all hardwood plywood itself, the number of employees between the two companies is not fully comparable.  The number of employees is still comparable, however, to a reasonable extent. Dongfangjuxin: not taking into account core and face veneer cutting workers, the total direct and indirect workers ranged from [        ] during the 17-18 review (the number of workers is primarily determined by the volume of merchandise ordered because most of the work is done manually by workers. See Exhibit SQ1-47 (see CR-87) (originally submitted as Exhibit SQ3-30 in Chengen's 17-18 review). Finewood:  The number of workers ranged from [          ] in the period, which is within the range of Dongfangjuxin's number of employees.  *See*, Exhibit SQ1-48 (see CR-88) (submitted as Exhibit 4 in CBP's EAPA investigation).

 **e. Significance of Investment in Vietnam.** As can been seen from the above and in Exhibit SQ1-42 (see CR-83) Finewood's level of investment exceeds Chengen's investments in terms of initial capital, purchases of equipment and machinery, and cost of production, and is otherwise comparable to Chengen's investment in every respect. Commerce considers Chengen to be a significant and representative producer of subject merchandise in China, and, accordingly, Finewood is a significant producer of hardwood plywood in Vietnam.

 Commerce has no absolute threshold as to what it deems to be a "significant" investment,

NON-CONFIDENTIAL VERSION

but the court in *Bell Supply* reiterated Commerce's considerations as well as the purpose of this criterion. *See*, *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1295- 96 (Ct. Int'l Trade 2018) ("*Bell Supply V*") ("The goal of the substantial transformation test is to determine whether the processing is "of such significance as to require" that the merchandise be deemed to be from that country. Bell Supply IV, 888 F.3d at 1229 (quoting E.I. DuPont, 8 F. Supp. 2d at 858). In assessing significance, the investment required to produce the product is probative. *Bell Supply IV*, 888 F.3d at 1229 (quoting E.I. DuPont, 8 F. Supp. 2d at 858).  In assessing significance, the investment required to produce the product is probative.  *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1296 (Ct. Int'l Trade 2018) ("*Bell Supply V*").

The Bell Supply Court's more detailed explanation of Commerce's rationale in its level of investment analysis should also be considered. It is reasonably discernable that Commerce examines the capital investment required for downstream processing as a proxy for the degree of transformation. The greater the investment, the analysis goes, the greater the transformation of the product. This approach is reasonable, so as not to evaluate the level of investment in a vacuum. Different industries have different barriers to entry—a small capital investment in one industry might be significant in another. Therefore, in order to contextualize the investment in further processing, it is reasonable to compare the level of investment required at different processing stages within the same industry. A comparatively small investment in downstream processing indicates a lack of substantial transformation. Nowhere does Commerce state that in order to constitute a substantial transformation, the level of investment for the processing of unfinished OCTG must be equal to or greater than the cost of investing in a complete pipe mill. Commerce merely uses pipe mill investment as a comparative reference.  *Bell Supply V*, 348 F. Supp. 3d at 1296.  In this case, Dongfangjuxin's production data is used as a comparative reference, and

NON-CONFIDENTIAL VERSION

Finewood's investment in the production of hardwood plywood equals or exceeds that of Dongfangjuxin.  In applying the comparative analysis that Commerce and the Court in *Bell Supply V* consider to be a legitimate methodology, Finewood's level of investment must be considered significant and supports a finding of substantial transformation of two-ply panels into finished hardwood plywood in Vietnam, as "plywood from Vietnam" for purposes of Commerce's governing antidumping and countervailing duty laws and associated practice.

In the final analysis of Finewood's added value and level of investment in plywood production in Vietnam, these can be considered "total" added value and investment.  As noted above, the ITC Final Report of the plywood investigation indicates that most plywood producers start by acquiring "veneer" raw materials, as Finewood did.  In fact, most plywood producers in China begin their production process with manufacturing the plywood core from purchased veneer.  For instance, in both the 2012 and 2016 investigations of hardwood plywood from China, Commerce selected plywood producers as mandatory respondents who produced plywood from veneer purchased from third parties.  *See*, Exhibit SQ1-49 (see CR-89).

Despite receiving some two-ply veneer, Finewood could not skip any material steps to produce its plywood in Vietnam, even for those select products that incorporated the two-ply.  In other words, Finewood had to do all the veneer layup, almost all of the glue lines (the savings in time and cost would be minimal compared to the overall cost of production), all the hot and cold pressing, all the trimming and sanding, all the face veneer application, and all the UV coating, where required.  From the standpoint of investment, Finewood's production of hardwood plywood substantially transformed the raw materials acquired from China, including two-ply panels.

**C.   Some Of the Hardwood Plywood Which IGF Purchased From Finewood Was Not Produced Using Two-Ply Cores And Therefore Must Be Excluded From The**

NON-CONFIDENTIAL VERSION

**Scope Determination.**

Generally, plywood is produced from core veneers. The core veneers are glued together to form a core platform, then the face/back veneers are attached to the core platform to form the completed plywood. 2-ply consists of 2 layers of core veneers already glued together. To produce core platform from 2-ply, Finewood glued together multiple 2-plies to form the core platform as per the order specifications. The vast majority of plywood produced by Finewood were from [          ] in thickness (accounting for over [                    ]; such plywood consists of at least [     ] layers of core veneers. Finewood never used only one 2-ply as the core to produce plywood. Indeed, for the production of [  ]mm plywood, Finewood used individual core veneers, instead of 2-ply. Therefore, the Scope Ruling does not apply to any [         ] hardwood plywood which IGF purchased from Finewood. See Finewood Questionnaire Response dated April 9, 2020 (see PR-26, CR-3) and the list of sales in Exhibit 5 to Finewood's Questionnaire Response for Certain Exhibits dated April 23, 2020 (see PR-28, CR-4 through CR-7) to supplement Finewood's Questionnaire response previously submitted on April 9, 2020.

**D.   Analysis Under Notice of Final Determination of Sales at Less than Fair Value Compels the Conclusion that Substantial Transformation Occurred in Vietnam.**

The case of the *Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Carbon Steel Flat Products from Argentina*, 58 F.R. 37062-01, 1993 WL 248,538 (F.R.) (Dep't. Comm. July 9, 1993) ("Cold-Rolled Carbon Steel Flat Products") is instructive here. In that case, Commerce disagreed with a Customs ruling that only "full annealing" (galvanization at a substantially higher temperature) constituted "substantial transformation" of cold-rolled carbon steel sheets. Rather, Commerce held that any galvanization substantially transforms cold-

NON-CONFIDENTIAL VERSION

rolled carbon steel sheets.  Likewise, here, manufacturing plywood from two-ply panels substantially transforms the two-ply panels.

Commerce in *Cold-Rolled Carbon Steel Flat Products* held that "galvanizing constitutes substantial transformation" and, thus, "cold-rolled sheet that is galvanized in a subject country is substantially transformed into a product of that country."[39]  It did not matter whether the galvanization involved fully annealing at a higher temperature or not.  Commerce analyzed the situation as follows:

> The process of galvanizing does not involve simply painting cold-rolled sheet with zinc.  It is a bonding process, which changes the character and use of the sheet.  The galvanizing transforms the physical character of the cold-rolled sheet from a non-corrosion resistant to a corrosion-resistant material.  The galvanized sheet is intended for use in applications where corrosion-resistance is important because of exposure to the elements, such as construction or the production of certain products. . . .  Cold-rolled sheet cannot be used for such applications.  Thus, galvanizing changes the character and use of the steel sheet, i.e., results in a new and different article.[40]

Here, the analysis is the same.  The character and use of two-ply panels are changed by the process of manufacturing plywood in Vietnam.  It is not merely a process of gluing veneers together.  It involves the positioning of an individual veneer on top of another, properly gluing and pressing the wood sheets together, cutting, patching, trimming, sanding, and adding ultraviolet coating.  Further, the physical character of the two-ply panels is changed from a flexible material

---

[39] *Id.* at 36067.
[40] *Id.*

NON-CONFIDENTIAL VERSION

into rigid plywood.  The plywood is intended for use in applications very different from the applications for two-ply panels.  Two-ply panels cannot be used as plywood.

Commerce in *Cold-Rolled Carbon Steel Flat Products* based its decision on the five factors.  It did not consider the added value factor more important that the others.  Rather, after determining that a new and different article was created, Commerce noted, "In addition, galvanizing adds substantial value."[41]

The same result is required here.  Because a new and different article is created in Vietnam by manufacturing plywood of two-ply panels and because substantial value is added, there occurs substantial transformation of the two-ply panels in Vietnam.  The country of origin of the plywood is Vietnam.

### E.   IGF Undertook Extensive Efforts to Verify That Finewood Possessed Sufficient Technology and Capacity to Produce the Plywood IGF Purchased.

In *Diamond Tools Tech. LLC*, 2021 Ct. Intl. Trade LEXIS 155 at 74-75, the Court remanded CBP's EAPA Determination finding that the importer, DTT USA, entered covered merchandise by means of a material and false statement or a material omission in declaring the covered merchandise Thai-origin instead of Chinese-origin.  *Id.*  The Court reasoned that:

> Customs in the Final Determination stated that "[b]ecause EAPA does not have a knowledge requirement for evasion as defined under 19 CFR 165.1, there is no requirement that the importer know of the material or false statement and, thus, [Customs] does not need to determine any level of culpability only that evasion occurred with entry." Final Determination at 8. Similarly, citing 19 C.F.R. § 165.1

---

[41] *Id.*

47

NON-CONFIDENTIAL VERSION

and 19 U.S.C. § 1517(a)(5), Customs in the Final Administrative Determination found that "a finding of evasion does not require an intentional or purposeful attempt by an importer to avoid duties." OR&R Final Administrative Determination at 9.

Customs' statements are insufficient as a matter of law in at least three respects. First, Customs' comment that it "does not need to determine any level of culpability only that evasion occurred with entry" is unclear at best and potentially tautological. Second, even if Customs' statement were readily comprehensible, neither the text of the EAPA statute nor 19 C.F.R. 165.1 supports Customs' statement that it does not need to establish "any level of culpability." *See* 19 U.S.C. § 1517(a)(5)(A); 19 C.F.R. § 165.1. Third, the plain language of Customs' decision does not address the issue of material omission, or material and false statement or act, which is covered both by the statute and Customs' regulations.

*Id.* at 70-72.

IGF was named in EAPA Cons. Case No 7252 as a potential importer of potentially Covered Merchandise. IGF responded to two Requests for Information ("RFI") issued by TRLED in the underlying EAPA Cons. Case No. 7252. IGF's initial RFI response consists of [     ] pages of narrative response and commercial documents. *See,* IGF Response to RFI (March 6, 2019). IGF's supplemental RFI consists of [   ] pages response and additional documents. *See,* IGF Response to Supplemental RFI (April 17, 2019).

In [        ], IGF visited Finewood's factory in Vietnam to inspect Finewood's production facilities. *See,* IGF Response to Question 6 – RFI, Exhibit 2 (March 6, 2019).

NON-CONFIDENTIAL VERSION

In [      ], IGF made another visit to Finewood's factory.  *Id.*  IGF's corporate officers personally observed the production process and legitimate plywood manufacturing operations.  *Id.*

From the due diligence IGF performed at its visits to Finewood's factory, IGF never had reason to doubt that Finewood was capable of producing sufficient, quality hardwood plywood for IGF's orders.  *Id.*

IGF submitted all requested CBP Forms for all Finewood's sales.  *See,* IGF Response to RFI, Exhibit 16. Exhibit 16 is organized by CBP entry packages, and within each package it includes CBP entry documents, commercial invoices, packing lists, purchase order, payment slips, sales confirmation, shipment correspondence, inbound and outbound transportation documents, freight payment, corresponding downstream customer purchaser orders and payments, etc.  *Id.*

## VIII.   CONCLUSION

The above analysis confirms that plywood must have at least three plies, consisting of a strong core and face veneer. Because the plain language of the Orders requires at least two plies and a core, or at a minimum three layers, the two-ply panels do not fall within the scope of the Orders.  Therefore, the Scope Ruling impermissibly expanded the scope of the Orders. Based on that impermissible expansion, CBP incorrectly determined that there is substantial evidence that IGF evaded the Orders.

Finewood's production of plywood in Vietnam is a very substantial and sophisticated process.  Furthermore, the two-ply panels imported from China (the upstream product) are a different class or kind of merchandise than plywood or veneered panels manufactured in Vietnam (the downstream product) described in the Orders.  The plywood and veneered panels in the Orders must have three plies. Therefore, the country of origin of the plywood is Vietnam, not China.

In light of the above, Plaintiff respectfully requests judgment from the Court as follows:

49

NON-CONFIDENTIAL VERSION

(a) Finding that the unambiguous scope language of the Orders on hardwood plywood from China does not cover two-ply;

(b) Finding that the ITC's injury investigation on hardwood plywood from China did not cover two-ply;

(c) Finding that Commerce unlawfully rejected relevant (k)(1) materials from its scope analysis;

(d) Finding that Commerce's substantial transformation analysis was arbitrary, capricious, and unsupported by substantial evidence; and

(e) Granting Plaintiff such other relief as is appropriate.

Sincerely,

*/s/ Ignacio J. Lazo*
Ignacio J. Lazo
Counsel for InterGlobal Forest LLC

NON-CONFIDENTIAL VERSION

### *ATTORNEY CERTIFICATION*

I, **Ignacio J. Lazo**, of **Cadden & Fuller LLP**, counsel to **InterGlobal Forest LLC**, certify the following:

(i)     All statements in this submission (and any attachments) are accurate and true to the best of my knowledge and belief.

(ii)    Any information for which I have not requested business confidential treatment pursuant to 19 CFR 165.4(a) may be released for public consumption.

(iii)   I will advise CBP promptly of any knowledge of or reason to suspect that the covered merchandise poses any health or safety risk to U.S. consumers pursuant to 19 C.F.R. 165.7(a).

*Signature:*      /s/Ignacio J. Lazo
                          Ignacio J. Lazo

*Date:*           August 16, 2022

51

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word using a proportionally spaced typeface (Times New Roman 12). In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 13,997 words.

In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

Sincerely,

*/s/ Ignacio J. Lazo*

Ignacio J. Lazo
Counsel for InterGlobal Forest LLC